Ramondo et ux., *v.* Pure Oil Company, Appellant.

Argued March 13, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

218

*Bruce W. Long,* with him *William A. Burns,* for appellant.

*William Taylor, Jr.,* with him *William R. Toal,* for appellees.

OPINION BY RENO, J., July 19, 1946:

Plaintiffs, husband and wife, alleging that appellant maliciously induced Carmen DiMaio to breach his contract with them, brought an action of assumpsit which later, with leave of court, was changed to trespass. The case was tried by a judge, without a jury, who found for plaintiffs for the full amount of their claim, and the judgment, upon exceptions, was approved by the court en banc. The case is here upon assignments of error which challenge: (a) The findings of fact, the conclusions of law, and the judgment; and (b) the allowance of the amendment changing the form of the action after the trial.

The appraisal of the conflicting testimony was for the trial judge, and his findings, approved by the court en banc, are binding upon us to the extent that they are supported by the evidence. Several minor errors appear in the findings, and some rest upon inferences and legal principles which we do not approve or regard as material. Our statement of the case will include the findings which we hold are testimonially supported and material.

The situation is unusual and complicated, and calls for an extended statement of the salient and controlling facts. Plaintiffs, hereinafter called the owners, erected a gas station upon their land, and Casmiro, the husband, acting for himself and, Carmello, his wife, by a written document dated November 14, 1932, leased the premises to appellant for the term of one year, with the yearly privilege of renewal for nine additional years. As rent, appellant agreed to pay one-half cent for each gallon of gasoline sold by lessee on the premises, in the record called "gallonage". By an agreement of even date, appellant appointed the husband as its agent to operate the premises, and the agent's compensation, called a commission, (really a gross profit), consisted of the difference between appellant's established retail prices for its products and its prices to dealers. On February 27, 1933, while their lease with appellant was still effective, the owners leased the station to Carmen DiMaio for two years, with the usual renewal clause, for the monthly rent of $50, and on April 20, 1933, appellant appointed DiMaio its agent to operate the station. Thus, at this point, the owners had executed two leases, one to appellant and one to DiMaio; and they were receiving two rents, the gallonage from appellant and $50 a month from DiMaio. DiMaio's compensation consisted of the commission above stated.

Notwithstanding subsequent changes in the relations between the owners and appellant, the owners' lease with DiMaio, renewed and modified from time to time, remained in force during the entire period covered by the litigation, and was in force at the time of the trial. It is this lease which the owners alleged was breached by DiMaio through appellant's wrongful interference.

Sometime in June, 1933, at the owners' direction, appellant commenced to pay the gallonage directly to DiMaio. This continued until November, 1935, when the arrangement was rescinded, and appellant was directed to pay it directly to the owners. This transaction

was evidenced by a letter dated November 21, 1935, written by the owners' counsel to appellant in which, inter alia, he stated: "Nothing herein is to be construed to prevent Mr. Ramando from collecting rent from Mr. DiMaio." Thereafter the owners again received gallonage from appellant and monthly rent from DiMaio.

This arrangement continued until the end of 1939. During December of that year the owners and appellant executed a written agreement for the construction of a luberdome, a device used in lubricating automobiles, under which appellant was to advance $1200 of its cost, and the balance, approximately $1000, was to be paid by the owners. Appellant's outlay was to be reimbursed by retention of the gallonage until its advance was repaid. During the negotiations, appellant's agent, Mr. Titzel, told Mrs. Ramondo that by the erection of the luberdome she "would collect more rent from DiMaio and DiMaio would make more business." The court below found that this and other statements constituted "the inducement which motivated the execution and delivery of the Ramondos of the said instrument and construction agreement of December 19, 1939." So far as the finding refers to an inducing cause, it is in our view irrelevant to the issue and will be disregarded, but it is retained for the purpose of indicating knowledge by appellant of the contractual relations between the owners and DiMaio.

The "said instrument" was a new lease of that date by the owners to appellant for five years from January 1, 1940, for the rent of one-half cent per gallon of gasoline sold by lessee upon the premises. This lease, the court found, was "intended merely to serve as an assignment or pledge to the Company of the one-half cent commission [gallonage] as collateral" for the advance made by appellant for the cost of the luberdome. This, too, is in our view unnecessary to the decision of the case, and is eliminated from further consideration. Notwithstanding the new lease, DiMaio remained upon the

premises, paying the owners $50 a month rent until July, 1940, inclusive, and thereafter $65 until September, 1941. The gallonage was retained by appellant pursuant to the luberdome contract.

The increase of DiMaio's rent was accomplished through appellant's agent. Acting upon the representation that the luberdome would produce more rent from DiMaio, the owners demanded $75 a month from him. DiMaio spoke to appellant's agent and through the agent's efforts the compromise figure of $65 a month was agreed upon. Appellant contends that its representative was not acting for it in that transaction, but for DiMaio, but it cannot successfully gainsay that its agent acted by reason of its knowledge of the contractual relation between the owners and DiMaio.

At this juncture appellant created the situation upon which the action is based. The new lease authorized it to sublet the premises, and in September, 1941, it did sublet the station to DiMaio and Angelo DiLulio, and appointed them to operate it. Under it DiMaio and DeLulio were to pay to appellant one-half cent for each gallon of gasoline delivered to the premises. Thus, the gallonage which appellant was required to pay to the owners, and which at the time it was retaining under the luberdome contract, was collected from DiMaio and his partner as rent for the station. In addition, DiMaio with appellant's knowledge, since its agent had arranged the compromise as to the rent, was required to pay $65 to the owners out of his commissions as appellant's station agent. Soon after this lease was executed, DiMaio ceased paying rent to the owners. This, the court below found, upon evidence which it found credible, most of it testified to by appellant's witnesses, resulted from statements made by appellant's agents to DiMaio to the general effect that appellant had "the basic lease", that DiMaio's lease was "absolutely impossible", and that "the lease [DiMaio's with the owners] was no good". Apparently he could not pay, out of the commissions,

both the gallonage to appellant and the rent to the owners, and for a considerable period he did not pay the gallonage. Caught in a squeeze, threatened with a levy and eviction by appellant if the gallonage was not paid, DiMaio, following its advice, decided not to pay, and did not pay, the rent to the owners. The final result was that appellant received gallonage from DiMaio which it credited against the luberdome contract; the owners received no rent from DiMaio and realized only the credit of the gallonage on the luberdome contract;[1] and DiMaio received the commission or profits on the business, less the gallonage.

Two facts are clearly established. First, in September, 1941, there was an existing contract between DiMaio and the owners, which had not been breached, discharged or repudiated, and which both parties recognized as binding upon them. Second, appellant induced DiMaio to default in the payment of his rent to the owners and thereby to breach that contract. The only remaining question is whether appellant's interference was wrongful and malicious, and the answer largely, or at least partly, depends, as appellant indicated in its statement of the question involved upon appeal, on whether it had knowledge of the owners' lease with DiMaio.

It must be acknowledged that the owners created an anomaly by executing two leases, one with appellant and one with DiMaio. Nevertheless, in the beginning no complication arose, for all parties seem to have recognized the substance behind the form of the document. The second lease was actually only an assignment of the owners' commission to DiMaio, in consideration for which he was to render the required services of operation

---

[1] The gallonage credited to the owners and applied to the liquidation of their indebtedness for appellant's advance upon the luberdome amounted to $18 to $22 a month, as nearly as it can be calculated upon the meagre evidence in the record upon this point.

and pay the owners $50 per month. Even so considered it was a contract, entitled to the protection of the law. It does not appear that appellant had actual knowledge of the DiMaio lease at its inception; his presence at the station was equivocal; he might have been there either as a servant or as a tenant of the owners. But when in 1933, appellant appointed DiMaio as its agent, and especially after it paid to him the gallonage it had contracted to pay to the owners, one would suppose that an old, experienced and astute business corporation would have definitely ascertained the nature of the legal relations between the owners and DiMaio. Passing that, appellant at all events did have exact information of that relation on November 21, 1935, when the owners' counsel expressly stipulated that the arrangement then made was not to be "construed to prevent Mr. Ramando from collecting rent from Mr. DiMaio." To appellant, skilled in the use and meaning of legal terms, the reservation of the right to collect *rent* could mean only that DiMaio was the owners' tenant, and this letter, remaining in appellant's files until produced by it at the trial, charged appellant with precisely that knowledge. Moreover, it acted upon that knowledge, and contemplated that the relation between DiMaio and the owners should continue, for its agent in the luberdome negotiations, represented to Mrs. Ramondo that its installation would permit the owners to collect an increased rent from DiMaio. And, finally, after the new lease was executed, appellant continued to deal with DiMaio, allowing him, without any authority except the appointment made under the old lease, to operate it as agent, without exacting either rent or gallonage from him, and intervened and aided in compromising the dispute between him and the owners in respect to the amount of the rent. In short, whatever the variables in the relations between the owners and appellant, DiMaio remained constant. He was always the owners' tenant; certainly after November, 1935, he was known by appellant to be their tenant; and

all appellant's actions after that date were consistent with that knowledge.

Having said that there was an existing contract between DiMaio and the owners; that appellant had knowledge of it; and induced DiMaio to breach it, we have virtually decided the case. For these elements comprise the gist of the action. "A contract confers certain rights on the person with whom it is made, and not only binds the parties to it by the obligation entered into, but also imposes on all the world the duty of respecting that contractual obligation. . . . If one maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer. . . . When one has knowledge of the contract rights of another his wrongful inducement of a breach thereof is a wilful destruction of the property of another and cannot be justified on the theory that it enhances and advances the business interests of the wrongdoer. . . . Maliciousness does not necessarily mean actual malice or ill-will, but the intentional doing of a wrongful act without legal or social justification": *Klauder v. Cregar*, 327 Pa. 1, 3, 7, 192 A. 667. Cf. *Caskie v. P. R. Transit Co.*, 321 Pa. 157, 184 A. 17; *Dorrington v. Manning*, 135 Pa. Superior Ct. 194, 4 A. 2d 886.

Appellant's able counsel concede the principle, but seek to avoid it by invoking the rule of justification referred to in Restatement, Torts, §773. The argument is predicated upon its primary contention that appellant had, in the words of its agent, "the basic lease on the premises", that is, that the lease of November 19, 1939, gave appellant the sole and exclusive right to occupy the property and to sublet it, and that the DiMaio lease was thereby abrogated. If supported by the evidence, the principle for which appellant contends might control the decision. But the fact is, as we have demonstrated, that before and after the execution of that lease appellant knew of the DiMaio-Ramondo lease. It may

be that the DiMaio lease was executed in violation of appellant's original lease, although if considered only as an assignment of commissions, as we have indicated, it may have been unassailable. But if it violated the first lease, appellant was at liberty to ignore DiMaio in subsequent transactions, and refuse to appoint him as its agent. But when it accepted the second lease in December, 1939, with knowledge of the outstanding lease between DiMaio and the owners, and for more than twenty months stood by and saw DiMaio continue to pay rent under it to the owners, it must be held to have recognized the contract and to have taken its lease subject to it. With the knowledge it possessed in December, 1939, it could have acted then by requiring cancelation of the contract as a condition for the new lease. But having permitted that opportunity to pass without action, and thus lulled the owners into a false sense of security, it was not justified twenty-one months later in "putting the squeeze" on DiMaio. By that time, because of its knowledge and the course of its dealings, appellant's lease was no longer "basic"; it was subject to, or qualified and conditioned by, the DiMaio contract. It no longer furnished justification for appellant's interference with the DiMaio contract to the harm of the owners.

The remaining assignment can be settled in a sentence. No objection was entered to the amendment in the court below, and the Act of May 10, 1871, P. L. 265, §1, 12 PS §535, authorizes the courts *"at any stage of the proceedings,* to permit an amendment or *change in the form of action . . ."* (Italics supplied). *New York & Pa. Co. v. N. Y. Cent. R. R.,* 267 Pa. 64, 110 A. 286.

The court entered judgment for rent from October, 1941, through June, 1943, at $65 a month, a total of $1365, plus interest, and this we affirm.

Judgment affirmed.