William LISTON, Hugh Gibson, Alan D. Lancaster, d/b/a Liston, Gibson and Lancaster, a Partnership, Plaintiffs,

v.

The HOME INSURANCE COMPANY, Defendant.

Civ. A. No. J85–0766(L).

United States District Court,
S.D. Mississippi,
Jackson Division.

July 22, 1986.

Grady F. Tollison, Patterson, Tollison & Alexander, Oxford, Miss., for plaintiffs.

James A. Becker, Jr., Jackson, Miss., for defendant.

## MEMORANDUM OPINION

TOM S. LEE, District Judge.

This diversity case came before the court for trial on the complaint of the plaintiffs, William Liston, Hugh Gibson and Alan D. Lancaster, d/b/a Liston, Gibson and Lancaster, a partnership, alleging that actions taken by employees of the defendant, The Home Insurance Company (Home), in settling the personal injury claim of Kathy Stewart, a client of Liston's, constituted tortious interference with a contractual relationship. Based upon the evidence adduced at the bench trial, the court makes the following findings of fact and conclusions of law.

On April 19, 1981, Kathy Stewart and her husband Roy Stewart were involved in an automobile accident at or near the intersection of State Highway 35 and Interstate Highway 55 in Vaiden, Mississippi. The Stewarts' vehicle was totalled as a result of the collision. The other vehicle involved in the accident was driven by Eloise Barclay, a Kentucky resident and an insured of Home. It was undisputed at trial that Barclay was at fault in causing the accident, and Home never contested its liability under Barclay's policy. Also as a result of the accident, Kathy Stewart suffered abrasions to the head, a slight concussion, a chipped or broken tooth and injury to the back and knee areas. She was hospitalized for one day following the accident and made several subsequent visits to physicians complaining of pain in the back and knee. It appears from the record, however, that she has not been treated by a physician for the injuries she sustained in the accident since July 1981.

On May 20, 1981, the Stewarts signed a written "employment agreement" authorizing plaintiff Liston to represent them in their personal injury claims against Eloise Barclay. The agreement was in the form of a standard contingent fee contract pursuant to which Liston would be paid 33⅓% of any amount recovered if the case were settled without suit, or 40% of any amount recovered after suit was filed.

Shortly after the accident, the Stewarts were visited at their home by Jo Reynolds,[1] a claims service representative with Home. Reynolds negotiated a property damage settlement with the Stewarts and thereafter mailed to them a "general release" purporting to release the Stewarts' claim for property damage in the amount of $2569.50. Roy Stewart took the release form to plaintiff Liston for his review. Liston modified the release form to more clearly indicate that it covered only the Stewarts' property damage claim, and the release was signed and returned to Home on May 29, 1981. By cover letter also dated May 29, 1981, Liston informed Home that he represented the Stewarts in their claims for personal injuries and that "[a]ny further communication concerning the Stewarts' claims for personal injuries should be directed to [Liston]."

No significant progress was made toward settling Kathy Stewart's claim over the next year. The claim was being administered by the Home office in Madisonville, Kentucky—being the office through which Eloise Barclay obtained her Home policy. William Ford, the manager of the Madisonville office, communicated with Jo Reynolds on several occasions during 1981 regarding the status of the Stewart claim. In October 1981, Ford authorized a raise in the reserve set aside by Home to cover Kathy Stewart's claim from $2000 to $8000. On November 10, 1981, Reynolds wrote Ford that she had discussed the claim with Liston and that Liston had represented that he would send an itemization of Kathy Stewart's medical and incidental expenses, or "specials," to Home by the end of November. No such itemization was sent. On January 15, 1982, Reynolds spoke with Liston by telephone. She thereafter wrote Ford stating that Liston had indicated that he would mail the itemization to her that week, that there was no permanent disability based upon a report from an orthopedist Stewart had visited, and that Liston was ready to settle the claim. Again, no itemization was sent. On March 11, 1982, Hayden Cox, the manager of the Home office in Jackson, Mississippi, wrote Ford that the medicals had not been sent by Liston, that "we are following the attorney every couple of weeks" and that it "appears he is lazy." Reynolds' records reflect that she called Liston's office in April 1982 but received no response. On June 24, 1982, she wrote Liston referring to her previous unanswered phone calls and requesting a status report. No response was received. On August 10, 1982, Reynolds wrote her last letter to Liston again requesting a status

---

1. Jo Reynolds was at some points during the relevant time period referred to as Jo Bessonnette. It appears that Ms. Reynolds was married during 1981 and went by the name Jo Bessonnette but was divorced in late 1981 and assumed her former surname Reynolds. For purposes of this opinion she will be referred to as Jo Reynolds.

report on the Stewart claim and again no response was received.

William Liston is past president of the Mississippi Trial Lawyers Association and a past candidate for the presidency of the Mississippi State Bar. The bulk of his present practice involves representation of plaintiffs in personal injury cases.

At trial, Liston testified that he defined Kathy Stewart's injury as one involving "soft tissue" damage, or one in which there is no objective, x-ray evidence of injury. Liston stated that although such "soft tissue" cases initially produce a negative finding of permanent injury by a physician, they can later become "chronic" and lead to permanent disability in some degree. Therefore, Liston reasoned, it is better for both client and attorney to wait as long as possible before settling or filing suit in a "soft tissue" case. Only by waiting and observing the progress of the injury can the attorney ensure that the client has reached maximum medical recovery, Liston concluded.

Liston further testified that he never sends interim medical bills to insurance adjusters over the course of a plaintiff's recovery from a "soft tissue" injury. Nor does Liston make an effort to communicate the progress of a client's recovery to an insurance adjuster at least until maximum medical recovery is reached. When such recovery is achieved, Liston stated that his practice is to negotiate only with an insurance company employee whose settlement authority equals the limits of the company's coverage under a given policy rather than with an adjuster in the position of Jo Reynolds, whose settlement authority is usually limited.[2] For those reasons, Liston

testified that he did not respond to the various communications of Jo Reynolds after January 1982. Charles Merkel, an attorney with twenty years' trial experience who specializes in a plaintiff personal injury practice in Clarksdale, Mississippi, testified as an expert witness in evaluating personal injury cases, specifically "soft tissue" injury cases. Merkel's opinion was that Liston's actions in handling Kathy Stewart's case substantially conformed with standards utilized by the plaintiffs' bar in Mississippi.

On November 11, 1981, Kathy Stewart wrote Liston regarding the reports sent to Liston by several doctors who had examined her and found no indications of permanent injury. She concluded, "I am not going to anymore [sic] doctors, as of right now, so go ahead with what you have to get the settlement complete." Liston then called Stewart and urged her to wait a while before settling her claim as it had little settlement value at that time. Stewart agreed and nothing further was done on the case until late summer of 1982. Indeed, Stewart stated that she never visited Liston's office and only spoke to him once or twice in chance meetings during 1982.

Stewart testified that throughout 1982 she was receiving past-due statements from the hospital for her April 19–20, 1981 stay, and that she had received letters threatening to garnish her wages to pay such overdue bills. On August 20, 1982, she wrote the Home office in Jackson, Mississippi requesting that a settlement be made on her claim in the amount of $2577.15.[3] Home did not respond to this

2. The per person limits of the Home policy issued to Eloise Barclay was $10,000. Jo Reynolds had settlement authority up to $5000 during the relevant time periods.

3. Stewart testified that she received a telephone call from Jo Reynolds in June 1982. Reynolds allegedly requested information on the status of the claim, and Stewart testified that they both discussed the difficulty in getting in touch with Liston. Reynolds denied that any such conversation took place at that time. The following evidence adduced at trial weighs in the court's credibility choice: in Stewart's August 20, 1982

letter to Home, she refers to a conversation with "Jo Bessonnette," indicating that the conversation referred to occurred during Reynolds' initial visit with the Stewarts in 1981 when she went by the name Bessonnette; Reynolds' notes made contemporaneous with the events in question, to which this court attaches credibility, do not reflect that such call was made to Stewart in June 1982, and her notes on the October 1, 1982 call reflect the various numbers she called before reaching Stewart, indicating some time lapse since their last conversation. The court therefore finds that Reynolds did not initiate contact with Stewart in June 1982.

letter. On September 17, 1982, she reiterated the settlement request in a letter denominated "Second Request!" Reynolds responded by phoning Stewart on October 1, 1982 at Stewart's place of employment at City Hall in Vaiden, Mississippi. The substance of Stewart's communication to Reynolds was as follows: that the Stewarts were still receiving a number of bills owing as a result of the accident; that Liston had made no attempt to settle the case; that Stewart did not know what was going on in the case and that therefore she was going to handle it herself. In response to Reynolds' question regarding whether Liston was still representing her in the claim, Stewart stated that she could not get in touch with him so she had decided to handle it on her own. Reynolds then instructed Stewart to get all her medical bills together, plus documentation of other losses including lost wages, and to send them to the Home office. After receiving all necessary documentation, Reynolds again contacted Stewart on January 6, 1983. The parties negotiated a settlement of the claim for $3575, representing payment of Stewart's medical bills and her claimed lost wages,[4] plus $1000 in cash. A general release was signed by the Stewarts on January 10, 1983, and a check was remitted to the Stewarts upon receipt of the release.

It was undisputed at trial that Reynolds made no attempt to verify Stewart's vague references to Liston's continuing involvement in the case. She neither called Liston's office nor sent Liston copies of the two settlement request letters from Kathy Stewart. The court specifically finds that Stewart did not represent to Reynolds in the October 1, 1982 phone conversation that Liston was presently relieved or had withdrawn from the case. Even if the court were to fully credit Reynolds' testimony—that Stewart told her that she and her husband were going to terminate Liston—regarding that conversation, the information she possessed was insufficient to relieve her of a responsibility to at least verify with Liston the extent of his involvement at that point. The court concludes

that Reynolds had no reasonable basis for undertaking direct negotiations with Stewart without going first through Liston.

Liston did not learn of the settlement until the fall of 1984, when he instructed his partner, Alan Lancaster, to update some old files. Lancaster called Reynolds to check on the status of the Stewart claim and Reynolds informed him of the settlement. While it appears that Liston's handling of the claim involved at least some inattention—almost three years elapsed from Liston's last active involvement in the case until Lancaster sought to resuscitate it—nothing exists in the record to indicate that Liston's conduct was sufficient to infer a waiver of his rights under the employment agreement with the Stewarts. The complaint in this cause, alleging intentional interference with contractual relations and conduct on the part of Home meriting an award of punitive damages, followed accordingly.

*Intentional Interference with Contractual Relations*

■ The Mississippi Supreme Court, the decisions of which this court is *Erie*-bound to apply, recognizes the tort of intentional interference with a contractual relation. One who intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for pecuniary loss resulting to the other from the failure of the third person to perform the contract. *Shaw v. Burchfield*, 481 So.2d 247, 254–55 (Miss.1985); *Protective Service Life Insurance Co. v. Carter*, 445 So.2d 215, 216–17 (Miss.1983); *Cranford v. Shelton*, 378 So.2d 652, 655 (Miss.1980); *Irby v. Citizens National Bank of Meridian*, 239 Miss. 64, 121 So.2d 118, 119 (1960); *Bailey v. Richards*, 236 Miss. 523, 111 So.2d 402, 207 (1959); *Restatement (Second) of Torts* § 766 (1979). The elements of a cause of action for wrongful interference with a contract are well established.

---

**4.** Reynolds testified that the claimed wage loss was not actually substantiated to her satisfaction, but that she allowed such claim in its entirety.

(1) that the acts were intentional and willful;

(2) that they were calculated to cause damage to the plaintiffs in their lawful business;

(3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of defendant (which constitutes malice); and

(4) that actual damage and loss resulted. *Carter*, 445 So.2d at 217; *Irby*, 121 So.2d at 119.

■ The element of willfulness and calculation does not require a showing on the part of the plaintiff that defendant had a specific intent to deprive plaintiff of contractual rights. Rather, the requisite intent is inferred when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract. *Cranford*, 378 So.2d at 655 (quoting *Ramondo v. Pure Oil Co.*, 159 Pa.Super. 217, 48 A.2d 156 (1946); *Restatement (Second) of Torts* § 766 (comment j). Once plaintiff has established a prima facie case of interference, the defendant may rebut with proof that his actions were either without knowledge of the existence of the contract, or were justified. *Mid-Continent Telephone Corp. v. Home Telephone Co.*, 319 F.Supp. 1176, 1200 (N.D.Miss. 1970).

■ Plaintiffs have clearly established a prima facie case of interference. Reynolds was obviously aware of the existence of the Liston-Stewart contract when she responded to Kathy Stewart's settlement pleas. She was also aware that settling Stewart's claim for $3575 would result in actual damage and loss to Liston under his contract with Stewart; indeed, Reynolds was aware that settling the case with the financially-distressed Stewarts would result in substantial savings for Home. She was also aware of the well-established policy of Home specifically, and the insurance industry generally, of never dealing directly with a client who is represented by an attorney. It would have been a simple and prudent matter to merely send Liston copies of Stewart's settlement request letters, or to resist direct communication with her until Liston's continued representation or lack thereof was verified.

■ Home argues, however, that Reynolds' actions were justified by the actions of Liston and statements of Stewart indicating that the contract had been abandoned. A contract will be treated as abandoned when acts or conduct on the part of one party inconsistent with the existence of the contract are acquiesced in by the other party. *See generally* 17 Am.Jur.2d Contracts § 484. Such acts or conduct must be positive and unequivocal to support a finding of abandonment. *Id.* No such acts or conduct exist here. Mere passage of time and inaction under the contract, especially in light of the peculiar nature of Stewart's injuries and the fact that she had six years from date of her injury to bring a cause of action against Home, cannot constitute abandonment. The insurance company had no right to assume that Liston had abandoned Kathy Stewart because he would not volunteer information to a claims representative, or had exercised his professional judgment to withhold immediate action on the claim pending a determination on permanent injury. Good business practices and simple prudence would have required more investigation into the extent of Liston's continuing involvement in the case. Thus, the court concludes that Reynolds' actions in settling the claim were not justified, were unlawful and were reasonably calculated to cause damage and loss to both Liston and his client.

■ The question of damages is difficult of precise calculation. As stated, the limits of Home's liability to Stewart, as set out in the policy issued to Barclay, were $10,000. On initial assessment of Stewart's claim, Home itself set a reserve of $8000 to cover its exposure. Both Liston and his expert, Charles Merkel, testified that the reasonable value of Stewart's case if it were tried to a jury would be between $10,000 and $25,000. Both testified that they would have settled the claim for $10,000, that

# 282

figure representing both the low side of their estimate of the value of the case if tried and the limits of the subject policy. Therefore, the court is of the opinion that a reasonable settlement value on Stewart's claim had Liston been involved in settlement negotiations would have been $10,000. Liston is entitled to recover $3333.33 from Home pursuant to his employment contract with the Stewarts.

*Punitive Damages*

■ Liston alleged in his complaint that he is entitled to recover punitive damages from Home in the amount of 0.399 per cent of the net worth of Home. Liston argues that he has assumed the role of a private attorney general in the punitive damages aspect of this litigation, and that punitive damages are appropriate in this case to punish Home for the conduct of Jo Reynolds in settling Stewart's claim and to deter other insurance companies from undertaking similar conduct in the future. *See Bankers Life & Casualty Co. v. Crenshaw*, 483 So.2d 254 (Miss.1985). Punitive damages have been allowed in cases involving intentional interference with contractual relations but only upon proof of aggravated conduct not supported by credible justification and evidenced by utter indifference and capricious disregard for plaintiff's contractual rights. *Mid-Continent Telephone*, 319 F.Supp. at 1200; *Bailey v. Richards*, 111 So.2d at 408. The court attaches no little significance to the finding of fact that Stewart initiated the settlement communications with Home. The settlement negotiations were handled through the mail rather than in a coercive, face-to-face communication. No affirmative misrepresentations regarding Liston's involvement in the case were made by Reynolds to Stewart; indeed, evidence that Reynolds had Stewart's interest at least to some degree at heart is found in her acceptance of Stewart's claimed lost wages and medical expenses, both of which she testified were not substantiated to her satisfaction. In sum, Reynolds' actions did not reflect the type of overreaching conduct on behalf of Home which normally justifies an award of punitive damages under Mississippi law.

Additionally, the court resists the temptation to equate the elements of intent or malice required to establish the tort of intentional interference with the type of intentional wrong, insult, abuse or gross negligence, evidencing ruthless disregard for the rights of others, for which punitive damages are imposed under Mississippi law. See *Standard Life Insurance Co. v. Veal*, 354 So.2d 239, 247 (Miss.1977); *Lincoln National Life Insurance Co. v. Crews*, 341 So.2d 1321, 1322 (Miss.1977); *Fowler Butane Gas Co. v. Varner*, 244 Miss. 130, 141 So.2d 226, 233 (1962). The fact that the court herein rejects Home's asserted justification for the actions of Reynolds—a belief that Liston had abandoned the employment contract with the Stewarts—does not logically necessitate a finding that her actions revealed utter indifference and capricious disregard for either Stewart or Liston. It cannot be denied that Liston's languid administration of the case contributed in some degree to the confusion and consequent wrongful conduct of Reynolds. No evidence was introduced showing that such discrete settlements were Home's standard practice or were encouraged by Home's managers. On the contrary, Reynolds violated a written company policy against dealing directly with claimants represented by an attorney when she responded to Kathy Stewart's settlement requests. The court has no hesitation in condemning Reynolds' conduct and sanctioning it through an award of damages. In this case, however, the court is of the opinion that no evidence of ruthless disregard for the rights of Liston or the insurance public exists to support an award of punitive damages, and the goals of punishment and deterrence would not be substantially served by allowance of a punitive damages award.

*Conclusion*

In summary, the court concludes that plaintiff should recover from defendant the sum of $3333.33 for intentional interference with contractual relations. Pre-litigation direct dealing by an insurance company with a claimant without the knowledge and consent of an attorney retained to rep-

resent the claimant cannot be countenanced by a court of law. Under the particular facts of this case, however, an award of punitive damages is not warranted.

A separate judgment shall be submitted according to the local rules.