**S.W. JORDAN and Jordan Electric Company, Inc., Plaintiffs,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY and Fidelity and Guaranty Insurance Company, Defendants.**

No. J91–0423(L)(C).

United States District Court, S.D. Mississippi, Jackson Division.

June 18, 1993.

---

David Cobb, J.A. Jennings, Jackson, MS, Wm. C. Walker, Jr., Oxford, MS, for plaintiffs.

James L. Carroll, Myles A. Parker, Watkins & Eager, Jackson, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendants United States Fidelity and Guaranty Company (USF & G) and Fidelity and Guaranty Insurance Company (FGIC) for summary judgment or, in the alternative, for partial summary judgment eliminating claims for punitive damages. Plaintiffs S.W. Jordan and Jordan Electric Company, Inc. have responded to the motion. The court has considered the memoranda of authorities submitted by the parties, together with attachments, and concludes that defendants' motion is well taken and should be granted.

### FACTS

This case involves a dispute between the parties as to FGIC's obligations under a certain policy of liability insurance issued to plaintiffs by FGIC.[1] Plaintiffs brought this action demanding compensatory and punitive damages from defendants, alleging that

FGIC failed and refused, in bad faith, to settle a covered claim on behalf of plaintiffs, insureds under the policy issued by FGIC, despite demand by plaintiffs for settlement. Plaintiffs maintain that FGIC's failure in this regard resulted in the loss of a significant business customer of Jordan Electric and caused S.W. Jordan to suffer severe emotional distress. The events giving rise to this action are set forth below.

On January 1, 1986, Jordan Electric contracted with Georgia–Pacific Corporation to perform certain electrical work at Georgia–Pacific's Monticello, Mississippi plant. Under the terms of this agreement, Jordan Electric was required to maintain in force, and to provide to Georgia–Pacific evidence of, workers' compensation insurance and comprehensive general liability insurance, with a minimum of $500,000 in coverage for bodily injury. Jordan Electric further agreed that it would provide indemnity in favor of Georgia–Pacific in accordance with the following provision:

> CONTRACTOR shall protect, defend, indemnify and hold G–P [Georgia–Pacific] and its agents and employees· harmless from any losses, costs, expenses, claims, damages, demands, liabilities, suits, actions, recoveries and judgments of every nature and description arising out of this Agreement or the performance of the Work or resulting from the performance or non-performance by CONTRACTOR of this Agreement except when caused by the sole negligence of G–P, its agents and employees.

At the time this contract was entered into between Jordan Electric and Georgia–Pacific, there was in effect a special multi-peril insurance policy, No. SMP 052411656, issued by FGIC to S.W. Jordan and Max Jordan, individuals, and Jordan Electric. The policy, which covered the period of September 1, 1983 to September 1, 1986, provided general aggregate coverage limits of $500,000. The policy included "contractual liability coverage," which provided coverage for liability

---

1. USF & G and FGIC are divisions of USF & G Insurance. This suit was originally brought against USF & G. However, since FGIC actually issued the policy that is at issue in this case,

FGIC intervened as a party defendant. Therefore, references herein to the insurer are to FGIC.

which Jordan Electric could incur under its contract with Georgia–Pacific.[2]

On June 20, 1986, after Jordan Electric had commenced its work under this agreement, a Jordan Electric employee, Robert Fortenberry, was injured at the Georgia–Pacific job site. USF & G, as Jordan Electric's workers' compensation carrier, paid Fortenberry $51,677.94 in workers' compensation benefits on account of his injuries. Thereafter, Fortenberry and his wife filed suit against Georgia–Pacific in the United States District Court for the Southern District of Mississippi, alleging that Georgia–Pacific had been negligent in failing to provide Fortenberry a safe place to work. More specifically, the Fortenberrys charged that while pulling new wire cables through cable trays used to hold the overhead wires in the plant, Robert Fortenberry came into contact with an energized wire and was violently shocked, causing him to fall twenty feet to the concrete floor below. It was alleged that Fortenberry was an invitee on Georgia–Pacific's premises at the time of this accident, that Georgia–Pacific knew or should have known of the existence of and dangers posed by the uninsulated energized wires in its cable trays, and that Georgia–Pacific failed to discover and correct the condition or to warn of its existence. Georgia–Pacific's alleged negligence in this regard was charged by the Fortenberrys to have been "the proximate cause of the occurrence in question and the plaintiff's resulting injuries." The Fortenberrys demanded $3,500,000 in damages. USF & G intervened in the action, asserting its right to subrogation for the workers' compensation benefits from any recovery Mr. Fortenberry might receive in his lawsuit.

On June 29, 1988, upon being served with the summons and complaint in the Fortenberry action, Georgia–Pacific, through its counsel, made demand on Jordan Electric, under the indemnity clause of the parties' agreement, to assume the defense of the Fortenberrys' lawsuit and provide indemnity. In its demand letter, Georgia–Pacific referenced an initial report concerning Mr. For-

tenberry's injury and an investigation report prepared by Fortenberry's supervisor, both of which, according to Georgia–Pacific, indicated that Fortenberry had lost his footing and hand grip and slipped while moving from one cable tray to another, and one of which suggested that similar accidents could be prevented by Jordan Electric's requiring the use of safety belts and the use of ladders for exit and entry. Additionally, Georgia–Pacific included citations of Jordan Electric by the Occupational Safety and Health Association (OSHA) for failing to install standard guardrails and toeboards, and for failing to tie, block or otherwise secure portable ladders. Georgia–Pacific took the position that these documents "substantiate[d] that this accident was in no way caused by the sole negligence of Georgia–Pacific."

Jordan Electric forwarded Georgia–Pacific's request to FGIC for a response, and on July 15, 1988, FGIC advised Georgia–Pacific that its request for defense and indemnity was being denied, stating:

> It is our position that any liability would be based on the sole negligence of Georgia Pacific, therefore, we will not assume the defense or indemnify Georgia Pacific for any losses they may incur as a result of this accident.

By letter of the same date, FGIC advised S.W. Jordan and Max Jordan that it was denying Georgia–Pacific's request for indemnity and defense of the case.

After being notified by FGIC that its request for defense and indemnity was denied, Georgia–Pacific filed a third-party complaint against Jordan Electric, seeking an adjudication that Jordan Electric was obligated under the parties' contract to defend and indemnify it with respect to the Fortenberry lawsuit. In accordance with the terms of the insurance contract, FGIC hired attorney S. Wayne Easterling to defend Georgia–Pacific's third-party complaint against its insured, Jordan Electric. However, because the Fortenberrys' claim in the lawsuit was for an

---

**2.** The policy covered the liability assumed by the insureds under an incidental contract, which was defined to include "any contract or agreement relating to the conduct of the named insured's business." It is undisputed that the Georgia–Pacific contract was an "incidental contract" within the meaning of the policy.

amount in excess of FGIC's policy limits, Jordan Electric was advised that it could seek independent counsel at its own expense to assist in the defense of the suit. Jordan Electric hired attorney Anson Bob Chunn to provide independent counsel and advice regarding the issues in the lawsuit and Mr. Chunn, in turn, associated attorney Joseph L. McCoy, to assist in determining what, if any, defense and/or indemnity obligations Jordan Electric had with respect to Georgia–Pacific. As will be discussed in greater detail *infra*, these attorneys—both the attorney retained by FGIC and those retained by Jordan Electric as independent counsel—advised Jordan Electric that it was not liable to Georgia–Pacific and should defend the third-party action.

Georgia–Pacific moved in the Fortenberry litigation for summary judgment on its third-party claim, seeking a judgment adjudicating that it was entitled to defense and indemnity under its contract with Jordan Electric. Judge Henry T. Wingate, before whom the case was pending, denied Georgia–Pacific's motion, concluding that "a genuine issue of material fact exists with regard to what party's negligence was responsible for the plaintiff's accident and injury . . . ." The court was "not in a position to determine conclusively from the submissions made that any party [was] absolved of liability or solely responsible for the plaintiff's injuries." In his order denying the motion for summary judgment, Judge Wingate advised that after the close of the proof at trial, the case would be submitted to the jury on special interrogatories so that "the extent of any party's liability, if any, will be clear," and he cautioned:

> In the event the jury's decision determines that Jordan Electric Company, Inc., through its surety, owed Georgia–Pacific Corporation a defense in this cause, then third-party defendant, Jordan Electric Company, Inc., is hereby advised that *it would have denied said defense at its peril.* (emphasis in original).

Following Judge Wingate's ruling, the parties commenced settlement negotiations and

the Fortenberry litigation was ultimately concluded by way of a compromise settlement. Georgia–Pacific contributed $60,000 to the settlement, and Jordan Electric, through FGIC, contributed $20,000. Additionally, USF & G waived its subrogation rights with respect to the $51,677.94 workers' compensation benefits previously paid to Mr. Fortenberry. The Fortenberrys released all parties from any future liability, and Georgia–Pacific executed a release of all claims for defense and/or indemnity against Jordan Electric, and the case was dismissed with prejudice by order of the court dated October 19, 1990, the order of dismissal reciting that the case had been "compromised and settled to the satisfaction of all parties . . . ."

## PLAINTIFFS' ALLEGATIONS

Following the disposition of the Fortenberry litigation, S.W. Jordan and Jordan Electric brought the present action against FGIC charging that before and during the Fortenberry litigation, FGIC knew that Mr. Fortenberry's injuries were not due to the sole negligence of Georgia–Pacific and that, in spite of this knowledge, FGIC, without any basis in law or fact, refused to defend Georgia–Pacific or to enter into good faith settlement negotiations on behalf of Jordan Electric with Georgia–Pacific with respect to Jordan Electric's contractual defense and indemnity obligations to Georgia–Pacific. Plaintiffs further alleged that by refusing to defend and/or indemnify Georgia–Pacific on behalf of Jordan Electric, FGIC intentionally and improperly interfered with Jordan Electric's contractual relations, inasmuch as FGIC knew that its unfounded refusal would result in Jordan Electric's losing Georgia–Pacific's business. Finally, plaintiffs alleged that not only did FGIC's wrongful breach of its obligations proximately cause Jordan Electric to lose Georgia–Pacific as a client, but also caused S.W. Jordan to suffer severe emotional distress. Plaintiffs demanded compensatory damages in the amount of $8,000,000, together with $30,000,000 in punitive damages.[3]

---

**3.** Of the $8,000,000 compensatory damages demanded, $7,000,000 was attributed to Jordan

Electric's loss of Georgia–Pacific's business and $1,000,000 was claimed for S.W. Jordan's emo-

## ANALYSIS

It is undisputed that FGIC owed no duty directly to Georgia–Pacific to defend or indemnify Georgia–Pacific. Its duties under its policy were owed only to its insureds. Georgia–Pacific was neither a named nor an additional insured under the insurance policy. The issue in this case, however, is not whether FGIC breached any duty to Georgia–Pacific, but rather is whether FGIC, by refusing to defend and indemnify Georgia–Pacific, breached its contractual duties to its insured, Jordan Electric.

■ FGIC argues in support of the motion for summary judgment that under the circumstances existing at and during the Fortenberry litigation, it was not required to defend or indemnify Georgia–Pacific on behalf of Jordan Electric. It argues that its only obligation under the insurance contract was to pay on Jordan Electric's behalf "all sums which the Insured shall become legally obligated to pay as damages ... [pursuant to] an incidental contract ..." and "to defend any suit against the Insured." Thus, unless or until such time as Jordan became legally obligated to pay damages to Georgia–Pacific, either in defense or indemnity costs, then any demand upon FGIC for the payment of such damages was premature.

In the court's opinion, FGIC was not obligated under the insurance policy and contract to agree, in the forefront, that it would provide indemnity to Georgia–Pacific under its insurance contract with Jordan Electric for any liability which might be assessed against Georgia–Pacific. FGIC's policy required that it

> pay on behalf of Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage even if the allegations are groundless, false, or fraudulent and may make such investigation and set-

tlement of any claim or suit as it deems expedient.

Thus, under the terms of FGIC's insurance contract with Jordan Electric, its duty to indemnify its insured would not arise at all until its insured became "legally obligated to pay" damages. *See Hopton Bldg. Maintenance, Inc. v. United Parcel Serv., Inc.,* 559 So.2d 1012, 1013 (Miss.1990) (language "by reason of any liability imposed by law" adopted common law indemnity requirement that there must be legal liability before a claim of indemnity arises). Demand was made on FGIC to agree to indemnify Georgia–Pacific for any liability which might be assessed against Georgia–Pacific in the Fortenberrys' lawsuit. At the time demand was made, there had been no determination that Jordan Electric was "legally obligated" to pay anything. The determination whether Jordan Electric was liable to indemnify Georgia–Pacific under the contract between those parties depended upon whether a jury determined that Georgia–Pacific was solely responsible for Fortenberry's injuries, as alleged by Fortenberry. Certainly, if a jury were to have determined that Georgia–Pacific was negligent and that its negligence was *the* proximate cause of Fortenberry's injuries, as the Fortenberrys had specifically alleged in their complaint, Jordan Electric would never have had an indemnity obligation to Georgia–Pacific. It would thus follow that in that instance, FGIC could have had no obligation to indemnify Georgia–Pacific on behalf of its insured. If it were decided that Georgia–Pacific was not liable to plaintiff, then there would have been nothing for which to indemnify Georgia–Pacific. Only if it were determined that Georgia–Pacific was not *solely* responsible for the plaintiff's injuries would Jordan Electric have been contractually obligated to indemnify Georgia–Pacific for the amount of damages assessed by the jury. In that event, Georgia–Pacific would have been entitled to a judgment against Jordan Electric on its indemnity claim—but unless and until that eventuality came to pass, any claim for indemnity by Jordan Electric against FGIC, or by Georgia–Pacific against Jordan Electric,

tional distress. And of the $30,000,000 punitive damages demand, $25,000,000 was requested for

Jordan Electric and the remaining $5,000,000 was requested for S.W. Jordan.

was premature. *See Motor Vehicle Casualty Co. v. GSF Energy, Inc.,* 193 Ill.App.3d 1, 140 Ill.Dec. 233, 549 N.E.2d 884 (1989) (in order for premises owner to invoke protection afforded by indemnity agreement contained in contract with contractor, premises owner must first be found liable to injured employee); *Alaska Nat'l Ins. Co. v. Industrial Indemnity Co.,* 757 P.2d 1052 (Alaska 1988) (insurer not required to indemnify its insured under insured's indemnity contract with owner where insured never became legally obligated to pay any sums as damages); *Jefferson v. Sinclair Refining Co.,* 10 N.Y.2d 422, 223 N.Y.S.2d 863, 179 N.E.2d 706 (N.Y.Ct.App.1961) (where contractor, the only insured, had not yet become legally obligated to pay anything, nor indeed had premises owner, claim by premises owner for coverage under contractual liability coverage of contractor's insurance policy was premature). As a result of the settlement of the Fortenberry case, and the release by Georgia–Pacific of any and all claims against Jordan, Jordan never became legally obligated to pay any damages to Georgia–Pacific. And, those damages which Jordan paid under the settlement were paid by FGIC as Jordan's insurer. Thus, FGIC has paid, in accordance with the terms of the insuring agreement, all sums which Jordan became "legally obligated to pay as damages."

■ Likewise, the evidence presented by plaintiffs would not reasonably support a finding that FGIC breached its defense obligations under the policy by refusing to defend Georgia–Pacific against the Fortenberrys' claims. Though Jordan Electric agreed in its contract to defend Georgia Pacific, FGIC agreed in the insurance contract only that it would pay such sums as its insured became legally obligated to pay as damages, and "to defend any suit against the Insured . . ." It was not required to defend Georgia Pacific on Jordan Electric's behalf but rather to defend its insured and to pay damages which Jordan Electric became legally obligated to pay, whether in the nature of defense costs or indemnity costs. It is undisputed that upon the filing of the third-party complaint against Jordan Electric, FGIC promptly retained counsel to represent its insured and thus provided the defense due its insured. And it is undisputed that the only damages which Jordan Electric ever became legally obligated to pay on account of the Fortenberrys' claims was the $20,000 that Jordan Electric agreed to contribute to the settlement of their claims. FGIC paid that $20,000 on behalf of Jordan Electric.

In *Jefferson v. Sinclair Refining Co., supra,* upon being sued by an injured employee of a contractor, the premises owner sought recovery against its contractor's liability insurance carrier based on an indemnity provision in its contract with the contractor similar to that contained in the Jordan Electric/Georgia–Pacific contract. The court concluded that the owner's claim for indemnity and defense costs was premature, stating:

> True it is that Lipsett (contractor) agreed to indemnify and save harmless Sinclair (premises owner) from personal injury claims arising out of the work involved in the contract between them, and to conduct the defense of any such suit against Sinclair. That was Lipsett's obligation. It also agreed to furnish an insurance policy by a company and in a form satisfactory to Sinclair. It did so.
>
> In that policy Sinclair was neither a named insured nor an additional insured. Since the endorsement on Lipsett's existing comprehensive policy under which Sinclair is claiming covers "contractual liability", the contract was identified in the endorsement. All Insurance Co. agreed to do, however, was to "pay on behalf of the insured all sums which the insured, by reason of the liability assumed by him under [the] written contract * * * shall become legally obligated to pay". Lipsett, the only insured, has not yet become legally obligated to pay anything; nor indeed has Sinclair. Until such event, any claim of Sinclair against Insurance Co. is premature.
>
> As to the "defense" provision of the policy, Insurance Co. is obligated only to "defend any suit against the insured", namely Lipsett, and that it is now doing. If Lipsett fails in its own undertaking to defend Sinclair, the latter may well have the right to recover the reasonable counsel fees and expenses incurred in defending plaintiff's action . . . Its claim for reimbursement of

a sum not yet known nor earned is, therefore, likewise prematurely made.

*Jefferson,* 10 N.Y.2d at 427, 223 N.Y.S.2d at 865–66, 179 N.E.2d at 708.

■ The conclusion that FGIC did not breach its duty to defend or indemnify Jordan Electric in accordance with the terms of the insurance contract is not dispositive of this case, however, for in addition to these duties, the insurer has a duty "to conduct litigation and settlement negotiations properly when acting on behalf of its insured." *Martin v. Travelers Indemnity Co.,* 450 F.2d 542, 551 (5th Cir.1971). And this duty to settle, unlike the contractual duty of indemnification, did not depend upon there being a judgment or other "legal obligation to pay."

■ Plaintiffs maintain in this case that FGIC breached its duty of good faith under the insurance contract by arbitrarily and in bad faith refusing to immediately settle Georgia–Pacific's third-party complaint against Jordan Electric. They argue that FGIC knew that, contrary to the allegations in the Fortenberrys' complaint, Robert Fortenberry's accident was not caused by the "sole negligence" of Georgia–Pacific; and FGIC further knew that Jordan Electric was substantially certain to lose Georgia–Pacific's business if Jordan Electric became or remained involved in litigation against Georgia–Pacific (that is, if Jordan Electric did not step in to defend and agree to indemnify Georgia–Pacific). Nevertheless, placing its own interest, and in particular USF & G's interest in subrogation, ahead of the interests of its insured, FGIC refused to immediately settle the third-party complaint (i.e., the contractual liability claim) by furnishing Georgia–Pacific a defense and agreeing to indemnify Georgia–Pacific for any liability which might ensue. This delay in settlement is alleged to have caused Georgia–Pacific to cease business dealings with Jordan Electric

and to have caused S.W. Jordan to suffer extreme emotional distress.[4]

■ An insurer has a duty to take reasonable steps to protect its insured's interests, which includes the duty to settle claims within the policy limits on objectively reasonable terms. *Hartford Accident & Indemnity Co. v. Foster,* 528 So.2d 255, 282 (Miss.1988). The insurer need not disregard its own interests, but it must give the insured's interests equal consideration if the potential recovery could exceed policy limits, and may not allow its interests to compromise the interests of its insured. This does not mean that the insurer is required, at all costs, to accede to its insured's demands or to settle a claim on terms dictated by its insured. Rather, the carrier's duty is to make a knowledgeable, honest and intelligent evaluation of the claim against its insured, and act accordingly. *Hartford,* 528 So.2d at 282 ("Although many times it would be in the insured's best interest to have the suit settled within the policy limits, the obligation of the insurer to settle within the policy limits is not absolute."). The rationale for this obligation was succinctly explained by the court in *Martin v. Travelers Indemnity Co., supra,* as follows:

> The insurer must consider the interests of the insured, as well as its own, every step of the way. This duty is imposed since, by assuming the burden of the insured's defense, the insurer "assume[s] exclusive control of the claim against the insured, and [takes] unto itself the power to determine for the insured all questions of liability, settlement, of defense and management before and during trial." *American Mut. Lib. Ins. Co. v. Cooper,* 5 Cir.1932, 61 F.2d 446.
>
> One of the most crucial of the insurer's obligations is its duty to evaluate any settlement offers from the joint perspective of its own interests and those of its insured.... [A]n insurer cannot be found

---

4. In contrast to the typical failure to settle case, plaintiffs here do not seek to recover damages for any excess judgment or settlement because Jordan Electric was never required to pay any sums to Georgia–Pacific on account of the Fortenberrys' claim. Indeed, Jordan Electric received a full release from any claims by Georgia–Pacific on its defense and indemnity claim. And, the

$20,000 it contributed to the settlement of the Fortenberrys' claim was well below the $500,000 policy limits and was actually paid by FGIC under the insurance policy. What plaintiffs seek here are incidental damages—damages for lost business and emotional distress—alleged to have resulted from FGIC's alleged breach of its duties under the insurance contract.

liable in excess of its policy limits for failing to settle an action unless its refusal to settle was so arbitrary and unreasonable as to constitute fraud. *Farmers Gin Co. v. St. Paul Mercury Indemnity Co.,* 186 Miss. 747, 191 So. 415 (1939).

*Martin,* 450 F.2d at 551.

Ordinarily, resolution of a claim of bad faith refusal to settle presents a question of fact which poses to the fact-finder the question whether the insurer properly considered the interests of its insured in refusing an offer of settlement. *Id.; see also Hartford,* 528 So.2d at 283 ("Objective reasonableness in this context is a question of fact committed by law to the trier of fact."). In this case, however, the undisputed facts of record would not warrant a finding that FGIC failed to exercise good faith in discharging this duty. Therefore, judgment by summary means is proper.

Plaintiffs now insist in this case that Jordan Electric's liability under the indemnity contract with Georgia–Pacific was clear from the very outset of the Fortenberry litigation, and indeed that FGIC knew there was no chance that Jordan Electric would avoid contractual liability under the Georgia–Pacific contract. On this issue, however, the uncontroverted evidence presented by USF & G and FGIC reveals that the attorney which it hired to represent Jordan Electric, as well as the attorneys hired by Jordan Electric to represent its interests, concluded that Jordan had a valid and defensible position with respect to Georgia–Pacific's claims. In correspondence with FGIC concerning this claim, Easterling advised:

> The major dispute in this lawsuit is going to be whether or not Georgia–Pacific ... [failed] to furnish [Robert Fortenberry] a safe place to work.... My best judgment is that we have considerably better than a 50% chance of prevailing on the indemnity on the merits.

Moreover, according to an affidavit signed by Easterling and submitted by USF & G and FGIC, during a September 28, 1988 conference attended by Easterling, Chunn, McCoy, S.W. Jordan and Max Jordan, Chunn and McCoy, Jordan Electric's own attorneys, advised S.W. Jordan that "[J]ordan Electric

... was not liable to Georgia–Pacific ... and ... should defend the third-party action." That this was the advice given by Jordan Electric's attorneys was confirmed by S.W. Jordan's own deposition testimony in the Fortenberry case. Specifically, Mr. Jordan stated:

> There is one reason [why Jordan Electric is not responsible for indemnifying Georgia–Pacific in the Fortenberry litigation and that is because] I have hired my personal attorneys to look into this matter; and from what he says, there is a fine line there that Georgia–Pacific doesn't deserve a defense from my insurance company.

It is true that in August 1988, immediately after the third-party complaint was filed, Thomas Joyner of the Ross and Yerger insurance agency, the agent responsible for procuring Joiner Electric's coverage, expressed to FGIC's claims department his opinion that Fortenberry was not injured due to the sole negligence of Georgia–Pacific and that Jordan Electric was therefore obligated to defend and indemnify Georgia–Pacific. However, FGIC was not obliged to settle the claim based merely on Joyner's assessment of the potential liability, particularly where it had legal advice discounting Joyner's opinion. Moreover, Jordan Electric's independent counsel, who became involved in the case *after* Joyner's letter to FGIC, advised Jordan Electric that its position was defensible. And there is no indication that these attorneys, at any time during the remainder of the Fortenberry litigation, changed their assessment of the case or that they ever expressed any dissatisfaction with Easterling's handling of the case. In fact, during the pendency of the case, neither Easterling, nor Chunn or McCoy on Jordan Electric's behalf, ever demanded that FGIC defend and agree to indemnify Georgia–Pacific against the Fortenberrys' complaint.

It is clear from the record that Jordan Electric, though of the view that it had done nothing wrong with respect to Fortenberry's accident, and having received advice from its attorneys that Jordan Electric should defend the third-party action, nevertheless was concerned early on about the potential business ramifications of refusing Georgia–Pacific's

demand for defense and indemnity, and of becoming involved in litigation against Georgia–Pacific. In fact, it appears that Mr. S.W. Jordan had communicated these concerns to Joyner, as well as to Mr. Easterling. In his August 1988 letter to USF & G, Joyner suggested that

> [u]nless USF & G does this (provide defense and indemnity to Georgia–Pacific), Jordan Electric is going to be in litigation with their customer, Georgia–Pacific, and will undoubtedly lose Georgia–Pacific as a customer. Moreover, it is our opinion that USF & G will be better off by stepping in at this point to defend the action for both Jordan Electric and Georgia–Pacific. We urge you to proceed along these lines. . . .

Similarly, Mr. Easterling, while disputing Joyner's assessment of Jordan Electric's obligations to Georgia Pacific, advised FGIC by letter dated August 23, 1988 that he had met with Max and S.W. Jordan, Jr., both of whom, while feeling strongly that Jordan Electric had done nothing wrong, "expressed concern about the business implications of ignoring Georgia Pacific's demand for indemnity." And later, in February 1989 correspondence with FGIC concerning the Fortenberry case, Mr. Easterling wrote:

> Georgia–Pacific is the major customer of Jordan Electric. Therefore, Jordan is quite anxious to avoid doing anything to antagonize Georgia–Pacific.

Mr. Easterling at that point, though, was of the view that there was "considerably better than a fifty percent chance of prevailing on the indemnity (claim) on the merits." Thus, while apart from Joyner's letter, there is nothing to indicate that Jordan Electric disputed its counsel's or FGIC's evaluation of the relative merits of the third-party claim against Jordan Electric, there is evidence to indicate that Jordan Electric wanted FGIC to settle the case. It appears, however, that Jordan Electric's desire that the case be settled related not to the merit, or potential merit of Jordan Electric's defense of the indemnity claim, but rather was based on Jordan Electric's desire to avoid losing Georgia–Pacific's business. Jordan Electric, the record shows, wanted FGIC to do whatever was necessary, as Mr. Easterling has de-

scribed it, to make "the whole problem go away; they didn't want to be bothered with it." But, according to Easterling's uncontroverted testimony, while Jordan Electric wished that the case could be settled, S.W. Jordan expressed that

> if they couldn't settle it, he was ready to go to trial because he felt very strongly that he was doing the right thing, that he was taking a legally acceptable position that was concurred in by his lawyers, and he . . . was willing to take the consequences if the settlement did not go through because he was prepared to go to trial.

Plaintiffs argue additionally that defendants' refusal to settle necessarily resulted in Jordan Electric's losing Georgia–Pacific's business since Jordan Electric was precluded, under the terms of the insurance policy, from settling itself. In this regard, the policy contained the following provision:

> The insured shall cooperate with the company and, upon the company's request, assist in making settlements. . . . The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for first aid to others at the time of accident.

According to plaintiffs, this cooperation clause prevented Jordan Electric from settling the claim on its own in order to preserve its business relationship. The facts show, however, that Jordan Electric never requested that it be allowed to defend and indemnify Georgia–Pacific in order to protect their business relationship. And further, the undisputed facts demonstrate that while Jordan Electric elected not to defend and indemnify Georgia–Pacific on its own, the reason that it chose not to do so had nothing to do with the policy's cooperation clause. In fact, at the time this was posed as an option, S.W. Jordan was, according to his own testimony, not even aware of the cooperation clause or the effect of that clause. In this regard, S.W. Jordan was asked during his deposition whether Jordan Electric ever considered "living up to your obligation under your contract with Georgia–Pacific, regardless of what USF & G decided to do." Mr. Jordan responded:

A. Are you talking about Jordan Electric Company taking on the defense of Georgia–Pacific at our expense?

Q. That's right.

A. That question was brought up but we had paid insurance premiums for this privilege from USF & G; and since that time, I have learned that if we had taken that action—in fact, Wayne Easterling asked me did I want to do that. And I told him that "I don't know how much money it's going to cost." *But I found out afterwards that had we done that, we would have violated the contract with USF & G and they would have no obligation whatsoever.* (emphasis added).

\* \* \* \* \* \*

Q. Whenever I asked you about this, you said that that question was raised?

A. This was before the settlement of the Fortenberry case.

This testimony does not support plaintiffs' assertion that Jordan Electric was prevented from settling Georgia–Pacific's claim against it because its "hands were tied by its insurance company."

█ The relevant inquiry in this case is not whether FGIC erred in its assessment of Jordan Electric's potential liability on the third-party claim, but rather is whether its assessment, under the totality of the circumstances, was unreasonable to the point of being arbitrary. In spite of plaintiffs' allegations in the case at bar, it is clear, considering the totality of the circumstances that existed during the pendency of the Fortenberry litigation, up to the time of settlement, that the plaintiffs were satisfied with FGIC's handling of the case. They were satisfied, based upon the advice of their attorneys, as was FGIC, that there was at least a reasonable chance of prevailing on the third-party claim. The fact that Jordan Electric was concerned about losing Georgia–Pacific as a client, while certainly a factor to consider, was not a sufficient reason to cause FGIC to relinquish its position on the claim—a position in which, by all accounts, plaintiffs then

concurred—and settle a claim which plaintiffs' own counsel had determined should be defended against.[5] In summary, the undisputed facts of record do not support plaintiffs' allegation that FGIC acted unreasonably, or arbitrarily, or in bad faith and in disregard of Jordan Electric's interests in refusing to settle this claim.

█ In addition to their claim for bad faith refusal to settle, plaintiffs have included in their complaint a cause of action for intentional interference with contractual relations. For many of the reasons discussed above, plaintiffs cannot succeed on this claim. Under Mississippi law, in order to prove intentional interference with contractual relations, the plaintiff must prove each of the following elements:

1. that the acts were intentional and willful;

2. that they were calculated to cause damage to the plaintiffs in their lawful business;

3. that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of defendant (which constitutes malice); and

4. that actual damage and loss resulted.

*Liston v. Home Ins. Co.,* 659 F.Supp. 276, 280 (S.D.Miss.1986). As this court has previously explained,

The element of willfulness and calculation does not require a showing on the part of the plaintiff that defendant had a specific intent to deprive plaintiff of contractual rights. Rather, the requisite intent is inferred when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract.

*Id.* In refusing to agree to defend and indemnify Georgia–Pacific in the case at bar, FGIC was exercising its legitimate right; its actions were not without justification. Consequently, even assuming plaintiffs could establish the remaining elements of the cause

---

5. A different conclusion might be indicated if only Mr. Easterling had been of this view, given his affiliation with the insurer. But the evidence

shows that plaintiffs' own attorneys concurred in his assessment of the case.

of action, they could not prevail on this claim. *See Martin v. Texaco, Inc.,* 304 F.Supp. 498, 502 (S.D.Miss.1969) (interference with contract not wrongful and actionable if undertaken by one exercising legitimate interest or right, as such is "privileged interference").

■ Plaintiff S.W. Jordan has alleged in this case a cause of action for intentional infliction of emotional distress predicated on FGIC's handling of Georgia–Pacific's claim against Jordan Electric. He seeks $1,000,000 for "severe emotional distress and injury to his business reputation." In Mississippi, "an action to redress injuries to a corporation, whether arising in contract or in tort cannot be maintained by a stockholder in his own name, but must be brought by the corporation because the action belongs to the corporation and not the individual stockholders whose rights are merely derivative ... even though the complaining stockholder owns all or substantially all of the stock of the corporation." *Bruno v. Southeastern Servs., Inc.,* 385 So.2d 620, 621 (Miss.1980). An exception to this rule arises where the stockholder seeks damages for the violation of a duty owed directly to him, *see Howell Steel Co., Inc. v. Trustmark Nat'l Bank,* 666 F.Supp. 930, 931 (S.D.Miss.1987), but the exception comes into play only where "the wrong itself amounts to a breach of the duty owed to the stockholder personally," *Schaffer v. Universal Rundle Corp.,* 397 F.2d 893, 897 (5th Cir.1968). The exception has no application "merely because the acts complained of resulted in damage both to the corporation and to the stockholder." *Id.*

Though S.W. Jordan was a named insured under the FGIC policy, this suit does not involve the breach of duties owing to S.W. Jordan as an insured. Rather, the claims in this action concern alleged breaches of duties owed to the corporation and seek to redress a wrong allegedly done solely to the corporation. And there is nothing to indicate that S.W. Jordan had any potential individual exposure. Under these circumstances, S.W. Jordan lacks standing to sue. *Cf. Stephen R. Ward, Inc. v. United States Fidelity & Guar. Co.,* 681 F.Supp. 389, 394–95 (S.D.Miss.1988).

## CONCLUSION

Based on the foregoing, it is ordered that defendants' motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

ORDERED.