# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-IA-00037-SCT

*REX DISTRIBUTING COMPANY, INC.*

*v.*

*ANHEUSER-BUSCH, LLC, MITCHELL BEVERAGE, LLC, MITCHELL REX DISTRIBUTING, LLC, MITCHELL DISTRIBUTING COMPANY, INC. AND D.G. YUENGLING AND SON, INCORPORATED d/b/a D.G. YUENGLING & SON, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/15/2017 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| TRIAL COURT ATTORNEYS: | ALYSSON LEIGH MILLS |
| | NATHAN LAMAR PRESCOTT |
| | PETER E. MOLL |
| | JAMES GRADY WYLY, III |
| | BRIAN D. WALLACH |
| | KYLE STUART MORAN |
| | ROBERT MAHONEY |
| | M. PATRICK McDOWELL |
| | TAYLOR BRANTLEY McNEEL |
| | WILLIAM C. HAMMACK |
| | JASON W. BURGE |
| | MOLLY L. WELLS |
| | GREGORY W. LANGSDALE |
| | ERIN DIANE SALTAFORMAGGIO |
| | W. WAYNE DRINKWATER, JR. |
| | ROY D. CAMPBELL, III |
| | MEAGAN OLIVIA LINTON |
| | R. DAVID KAUFMAN |
| | THEODORE J. ZELLER, III |
| | LAUREN OAKS LAWHORN |
| | ROBERT THOMAS SCHWARTZ |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |

ATTORNEYS FOR APPELLANT:    NATHAN LAMAR PRESCOTT
                            JOHN THOMAS LAMAR, III
                            ALYSSON LEIGH MILLS
                            JASON W. BURGE
                            MOLLY L. WELLS
                            TAYLOR ALLISON HECK
                            JOHN T. LAMAR, JR.
ATTORNEYS FOR APPELLEES:     JAMES GRADY WYLY, III
                            W. WAYNE DRINKWATER, JR.
                            M. PATRICK McDOWELL
                            TAYLOR BRANTLEY McNEEL
                            PETER E. MOLL
                            GREGORY W. LANGSDALE
                            BRIAN D. WALLACH
                            WILLIAM C. HAMMACK
                            ROY D. CAMPBELL, III
                            R. DAVID KAUFMAN
                            ROBERT MAHONEY
                            FRED L. BANKS, JR.
                            KYLE STUART MORAN
                            ERIN DIANE SALTAFORMAGGIO
                            MEAGAN OLIVIA LINTON
                            LAUREN OAKS LAWHORN
                            THEODORE J. ZELLER, III
NATURE OF THE CASE:         CIVIL - CONTRACT
DISPOSITION:                AFFIRMED IN PART; REVERSED IN PART;
                            AND REMANDED - 05/23/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## CONSOLIDATED WITH

## NO. 2018-IA-00038-SCT

*REX DISTRIBUTING COMPANY, INC.*

*v.*

*ANHEUSER-BUSCH, LLC, MITCHELL
BEVERAGE, LLC, MITCHELL REX
DISTRIBUTING, LLC, MITCHELL
DISTRIBUTING COMPANY, INC. AND D.G.
YUENGLING AND SON, INCORPORATED D/B/A
D.G. YUENGLING & SON, INC.*

| DATE OF JUDGMENT: | 12/15/2017 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | NATHAN LAMAR PRESCOTT |
| | JOHN THOMAS LAMAR, III |
| | JOHN T. LAMAR, JR. |
| | TAYLOR ALLISON HECK |
| | ALYSSON LEIGH MILLS |
| | JASON W. BURGE |
| | MOLLY L. WELLS |
| ATTORNEYS FOR APPELLEE: | FRED L. BANKS, JR. |
| | WILLIAM C. HAMMACK |
| | R. DAVID KAUFMAN |
| | ROY D. CAMPBELL, III |
| | W. WAYNE DRINKWATER, JR. |
| | JAMES GRADY WYLY, III |
| | M. PATRICK McDOWELL |
| | KYLE STUART MORAN |
| | TAYLOR BRANTLEY McNEEL |
| | LAUREN OAKS LAWHORN |
| | ERIN DIANE SALTAFORMAGGIO |
| | MEAGAN OLIVIA LINTON |
| | PETER E. MOLL |
| | GREGORY W. LANGSDALE |
| | BRIAN D. WALLACH |
| | ROBERT MAHONEY |
| | THEODORE J. ZELLER, III |
| NATURE OF THE CASE: | CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; AND REMANDED - 05/23/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1.    Rex Distributing Company was a wholesaler of Anheuser-Busch's beer.  When Rex sought to sell its business, Anheuser-Busch asserted a contractual right to "redirect" the sale

to its preferred buyer, Mitchell Distributing Company. Rex alleges that the redirect provision was void under Mississippi's Beer Industry Fair Dealing Act (BIFDA) and that Anheuser-Busch's interference with the sale caused it damages actionable under the same statute. The trial court dismissed Rex's claims against Anheuser-Busch and Mitchell for failure to state a claim upon which relief can be granted.

¶2. We conclude that Rex alleged a valid cause of action, so we reverse the dismissal of Rex's BIFDA claim against Anheuser-Busch and the derivative claims against Mitchell. We affirm the trial court's judgment dismissing Rex's other claims.

## FACTS AND PROCEDURAL HISTORY

¶3. This is an interlocutory appeal from a dismissal under Mississippi Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The following facts are drawn from Rex's complaint and, for our purposes, must be accepted as true. *See Pryer v. Gardner*, 247 So. 3d 1245, 1250 (Miss. 2018).

¶4. Like most states, Mississippi generally requires a three-tier distribution system for beer. The supplier makes the beer, the wholesaler distributes it, and the retailer sells it to the public. *See* Miss. Code. Ann. §§ 67-3-45 to -46 (Rev. 2012); *see generally* Brian D. Anhalt, *Crafting a Model State Law for Today's Beer Industry*, 21 Roger Williams U. L. Rev. 162, 171-73 (2016). The Mississippi Beer Industry Fair Dealing Act (BIFDA) further regulates the relationships between beer suppliers, wholesalers, and retailers, specifying things each can and cannot do. *See* Miss. Code Ann. §§ 67-7-1 to -23 (Rev. 2012). Our beer laws are similar to the general franchise laws present in many states. *See* Anhalt, *supra*, at 163-64.

4

¶5.    Rex was a beer distributor/wholesaler.  Anheuser-Busch is the largest beer supplier in the country.  Rex had a longstanding position as Anheuser-Busch's exclusive distributor for a swath of the Mississippi Gulf Coast.  The distribution contract between the two gave Anheuser-Busch a right of first refusal if Rex were sold—"at the price and on the terms and conditions applicable"—and the right to assign the sale to a third-party purchaser of Anheuser-Busch's choosing.  The parties call this a right to "match and redirect" the sale.

¶6.    When Rex attempted to sell, the high bidder was another nearby distributor, Adams Beverages, Inc.  The sale contract (called the Asset Purchase Agreement or APA) provided that the price would be determined by each individual distribution contract Rex successfully transferred to Adams.  This depended on the approval of each of the suppliers Rex distributed for—but  under Mississippi law, the suppliers' consent "shall not be withheld or unreasonably delayed to a proposed transferee who meets [certain] nondiscriminatory, material and reasonable qualifications and standards."  Miss. Code Ann. § 67-7-13(1) (Rev. 2012).

¶7.    Two days before Rex's sale to Adams was to close, Anheuser-Busch informed Rex it was exercising a right under the distribution contract to "match and redirect" the sale of Rex to Mitchell Distributing Company, Inc., another local distributor.  According to Rex's complaint, this eleventh-hour interference turned out to be part of a continuing scheme by Anheuser-Busch to manipulate its distributors. Anheuser-Busch had recently tried to convince its Mississippi distributors not to sell beer from one of its competitors, Yuengling and Son, but it had been mostly unsuccessful; Mitchell had been the only Anheuser-Busch

5

distributor to spurn Yuengling at Anheuser-Busch's request.[1] Rex alleged Anheuser-Busch asserted the match-and-redirect claim to reward Mitchell and simultaneously to punish Rex for selling a competitor's beer, since under the terms of the sale contract, Rex bore the risk its other suppliers would refuse the transfer of its distribution rights to the new purchaser. That is what Rex alleged Yuengling ultimately did when Rex acceded to Anheuser-Busch's demand, costing Rex $3.1 million and leading to this lawsuit.

¶8.    Rex sued Anheuser-Busch, Mitchell, and Yuengling.  Rex accused Anheuser-Busch and Mitchell of common-law tortious interference with contract and civil conspiracy.  It also alleged that Anheuser-Busch's exercise of the match-and-redirect provision violated the Mississippi Beer Industry Fair Dealing Act and Anheuser-Busch breached its contract with Rex by failing to ensure Rex received the same price it would have had Anheuser-Busch not redirected the sale.  The trial court dismissed all these counts for failure to state a claim under Rule 12(b)(6).  Finally, Rex alleged Yuengling had violated BIFDA by refusing the proposed transfer to Mitchell of Rex's Yuengling distribution rights.  This claim survived the motion to dismiss and remains pending in the trial court.  This Court granted Rex's petitions for interlocutory appeal from the judgments dismissing its claims against Anheuser-Busch and Mitchell, and the appeals have been consolidated.

### DISCUSSION

1.    **Beer Industry Fair Dealing Act, Mississippi Code Section 67-7-13**

---

[1] Rex alleged that Mitchell had accepted Anheuser-Busch's request not to sell Yuengling in Mississippi in exchange for help in another market.

6

¶9.     The Mississippi Beer Industry Fair Dealing Act (BIFDA) provides in part that a supplier "shall not interfere with, prevent or unreasonably delay the transfer of the wholesaler's business" so long as the proposed transferee "meets such nondiscriminatory, material and reasonable qualifications and standards required by the supplier for similarly situated wholesalers." Miss. Code Ann. § 67-7-13(2) (Rev. 2012). In relevant part, the statute further permits the supplier to refuse to accept the transfer only "in good faith and for good cause related to the reasonable qualifications" of the transferee. *Id.*

¶10.    At the outset, we observe that we are reviewing the granting of a motion to dismiss for failure to state a claim under Mississippi Rule of Civil Procedure 12(b)(6). At this stage in the litigation, the allegations of Rex's complaint must be accepted as true. *See **Pryer v. Gardner**,* 247 So. 3d 1245, 1250 (Miss. 2018). Thus we are required to credit the allegations in the complaint that the original proposed transferee, Adams, was reasonably qualified and that Anheuser-Busch lacked good cause to refuse to accept the transfer to Adams.

¶11.    BIFDA further provides that wholesalers may not waive its protections: "[a] wholesaler may not waive any of the rights granted in any provision of this chapter and the provisions of any agreement which would have such an effect shall be null and void." Miss. Code Ann. § 67-7-17 (Rev. 2012).

¶12.    Rex alleges BIFDA rendered the "match and redirect" contract provision void and that Anheuser-Busch's demand violated Section 67-7-13(2) by "preventing" or "interfering with" the transfer of its business. Anheuser-Busch responds that it did not violate Section 67-7-13(2) because Rex's business was transferred—just not to the company to which Rex wanted

7

it transferred. The trial court found this reasoning persuasive and dismissed Rex's BIFDA claim.

¶13. The interpretation of a statute is a question of law, and the standard of review on appeal is de novo. ***Natchez Hosp. Co. LLC v. Adams Cty. Bd. of Supervisors***, 238 So. 3d 1162, 1163 (Miss. 2018). This Court has never interpreted Section 67-7-13(2), and we are not aware of any decisions interpreting similar provisions found in the law of some other states.[2] Nor have the parties cited any outside authorities, either by courts or commentators. We consider this to be a matter of first impression.

¶14. That being said, Anheuser-Busch's stepping in to insist Rex sell its business to someone else amounted to "preventing" the proposed transfer under any definition of the word. Anheuser-Busch likewise "interfered" with the proposed transfer. The only conceivable definition of the word "interfere" that might not apply would be if it had been used as a term of art referring to common-law tortious interference with contract, which has not been argued by any of the parties to this appeal. Reading "interfere" as a term of art would contradict the oft-cited (and statutorily mandated) rule of statutory interpretation that nontechnical "[w]ords contained in statutes are to be interpreted 'according to their common and ordinary acceptation and meaning.'" ***Alfonso v. Diamondhead Fire Prot.***, 122 So. 3d 54, 56 (Miss. 2013) (quoting Miss. Code Ann. § 1-3-65 (Rev. 2005)). BIFDA defines seventeen different terms, but "interfere" is not one of them. *See* Miss. Code Ann. § 67-7-5

---

[2] States with analogues to section 67-7-13(2) include: Louisiana (La. Stat. Ann. § 26:806), Alabama (Ala. Code § 28-9-7(2)), Idaho (Idaho Code § 23-1104), Iowa (Iowa Code § 123A.6), and Nebraska (Neb. Rev. Stat. § 53-219).

(Rev. 2012).  We observe, also, that it is impossible for a supplier like Anheuser-Busch to tortiously interfere with the sale of its distribution rights, because the supplier is a party to the contract for the sale of its distribution rights.  *See **Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.***, 611 So. 2d 238, 247 (Ala. 1992) (interpreting a similar agreement to the one in the instant case); *see also **Genet Co. v. Annheuser-Busch, Inc.***, 498 So. 2d 683, 684 (Fla. Dist. Ct. App. 1986) (likewise).  "A party to a contract cannot be liable for tortious interference with the same contract."  ***Scruggs, Millette, Bozeman & Dent, P.A. v. Merkel & Cocke, P.A.***, 910 So. 2d 1093, 1098 n.3 (Miss. 2005) (citing ***Par Indus., Inc. v. Target Container Corp.***, 708 So. 2d 44, 48 (Miss. 1998)).  "[T]he wrongdoer [must be] a 'stranger' to the contract which was interfered with—an outsider."  ***Cenac v. Murry***, 609 So. 2d 1257, 1269 (Miss. 1992).  If "interfere" meant "tortious interference with contract," as the separate opinion contends it should, the statute would prohibit something that is already impossible, and it would offer distributors no protection whatsoever from unjustified interference.

¶15. We also note that Section 67-7-13(2) further protects a distributor's right to pass on her business to specific people after her death, i.e., designated members.[3] It reads, in its entirety,

> The supplier shall not interfere with, prevent or unreasonably delay the transfer of the wholesaler's business, including an assignment of wholesaler's rights under the agreement, if the proposed transferee is a designated member, or if the transferee other than a designated member meets such nondiscriminatory, material and reasonable qualifications and standards required by the supplier for similarly situated wholesalers. Where the transferee is other than a designated member, the supplier may in good faith and for good cause related to the reasonable qualifications refuse to accept the transfer of the wholesaler's business or the assignment of the wholesaler's rights under the agreement.

Miss. Code. Ann. § 67-7-13(2) (Rev. 2012). Were we to accept Anheuser-Busch's reading of the statute, that there has been no interference with *the* transfer as long as *a* transfer happens, the same interpretation should apply to transfers to designated members. That would permit an end-run around the statute's protections for designated members.

---

[3] BIFDA defines a designated member as

> the spouse, child, grandchild, parent, brother or sister of a deceased individual who owned an interest, including a controlling interest, in a wholesaler, or any person who inherits under the deceased individual's will, or under the laws of intestate succession of this state; or any person who or entity which has otherwise, through a valid testamentary device by the deceased individual, succeeded the deceased individual in the wholesaler's business, or has succeeded to the deceased individual's ownership interest in the wholesaler pursuant to a written contract or instrument which has been previously approved by supplier; "designated member" includes the appointed and qualified personal representative and the testamentary trustee of a deceased individual owning an ownership interest in a wholesaler, and it includes the person appointed by a court as the guardian or conservator of the property of an incapacitated individual owning an ownership interest in a wholesaler.

Miss. Code Ann. § 67-7-5(e) (Rev. 2012).

¶16. Any remaining doubt can be removed by considering the purpose Section 67-7-13(2) serves within Mississippi's regulation of the beer industry. BIFDA was expressly intended to "maintain stability and healthy competition in the light wine and beer industry in this state." Miss. Code. Ann. § 67-7-3(a) (Rev. 2012). Mississippi law requires separation between manufacturers and distributors; a manufacturer (and its officers, agents, employees, and affiliates) is not permitted to have "any interest in the license, business, assets or corporate stock of a wholesaler or distributor . . . ." Miss. Code. Ann. § 67-3-46(2) (Rev. 2012). Allowing a manufacturer to choose the owners of its wholesalers in perpetuity would undermine the statutory separation of the beer industry into three tiers.

¶17. We conclude that Rex has alleged a claim upon which relief can be granted: BIFDA rendered the match-and-redirect provision null and void, and Anheuser-Busch's demands premised on the void provision may have amounted to unjustified "interference" with Rex's transfer to Adams, an allegedly qualified transferee. BIFDA expressly provides a remedy for damages resulting from violations of its protections. Miss. Code Ann. § 67-7-15 (Rev. 2012). The circuit court's dismissal for failure to state a claim is reversed.

### 2. Breach of Contract—Anheuser-Busch

¶18. Rex also claimed that Anheuser-Busch breached its contract with Rex, which Rex contends required Anheuser-Busch to ensure Rex received "the same price, net of taxes, [Rex] would have received from the disapproved purchaser." We have held that under BIFDA the "provisions [of the contract between Anheuser-Busch and Rex] which would have [the] effect [of permitting interference with the transfer of Anheuser-Busch's

11

distribution rights are] null and void." Miss. Code Ann. § 67-7-17 (Rev. 2012). But it is not clear that the statute also nullifies Anheuser-Busch's obligation to pay for the transfer of the rights, and the contract between Anheuser-Busch and Rex includes an explicit severability clause. The enforceability question has not been raised as an issue on appeal by the parties. And we ultimately conclude that Rex has failed to state a claim for breach of contract, so the question of enforceability is moot and will not be addressed.

¶19.    The full provision at issue, Paragraph 4(b)(v), states,

> If Anheuser-Busch disapproves a proposed owner in Wholesaler's business solely because of (A) concern with the resulting Territory configuration or (B) market combinations to achieve economies of scale or enhanced sales opportunities, and if a sale is eventually completed to a party preferred and designated by Anheuser-Busch, then Anheuser-Busch shall ensure that the selling Wholesaler receives the same price, net of taxes, Wholesaler would have received from the disapproved purchaser.

¶20.    We observe, first, that the contract distinguishes between "disapproval" of a transfer, which is outlined in Paragraph 4(b), and "assignment," which is found later, in Paragraph 4(d). The same-price provision is found in Paragraph 4(b) (disapproval), and it expressly applies only "if [Anheuser-Busch] disapproves a proposed owner." The match-and-redirect paragraph, Paragraph 4(d), actually specifies its own way for the price to be determined: "at the price and on the terms and conditions applicable to such proposed [transfer]. . . ." Paragraph 4(d) omits the same-price language. Rex does not allege that Anheuser-Busch breached the contract by failing to ensure the price as specified in Paragraph 4(d).

¶21.    Even if it did apply to the transfer here, Paragraph 4(b)(v) conditions the "same price" language on Anheuser-Busch's disapproving the proposed transferee "*solely* because of (A)

12

concern with the resulting Territory configuration or (B) market combinations to achieve economies of scale or enhanced sales opportunities." (Emphasis added.) This is inconsistent with Rex's theory of the case, which was that Anheuser-Busch exercised the assignment provision with the intent of punishing Rex and rewarding Mitchell. Anheuser-Busch is permitted to plead alternative and inconsistent theories, but no allegation is made in the complaint that Anheuser-Busch acted solely for either of the reasons required by the same-price provision.

¶22. Rex also suggests a breach-of-contract claim may have arisen because an officer of Anheuser-Busch promised Rex it would receive the same consideration in the sale to Mitchell as it would have in the sale to Adams. But the breach-of-contract claim as articulated in the complaint alleges that the written contract between Anheuser-Busch and Rex governs, not the later communications. Rex's brief on appeal likewise never argued the representations were binding. Thus, we conclude that the question of whether the later representations were binding is not before us.

¶23. In summary, Rex relies on the same-price language in Paragraph 4(b)(v). That provision, by its own terms, is not applicable to the transfer that occurred here. We affirm the dismissal of the breach-of-contract claim.

### 3. Other Claims Against Anheuser-Busch

¶24. Rex also alleges, in a cursory fashion, that the circuit court erred in dismissing its other claims against Anheuser-Busch. No authority is cited, and the argument is directed entirely to refuting the reasons the trial court gave for granting the motion to dismiss. That

13

is insufficient to demonstrate reversible error. On appeal from a dismissal for failure to state a claim upon which relief can be granted, the appellant must show that it stated a claim, not merely refute the reasons the trial court gave for dismissing the claim. *See Satterfield v. State*, 158 So. 3d 380, 382 (Miss. Ct. App. 2015). At any rate, these claims are not properly before this Court because "[f]ailure to cite legal authority in support of an issue is a procedural bar on appeal." *Webb v. DeSoto Cty.*, 843 So. 2d 682, 685 (Miss. 2003) (citing *McClain v. State*, 625 So. 2d 774, 781 (Miss. 1993)).

### 4. Tortious Interference—Mitchell

¶25. Next, we address Rex's claim that Mitchell's alleged collaboration with Anheuser-Busch gave rise to a claim of tortious interference with Rex's contract to sell its business to Adams. Under Mississippi law, the elements of tortious interference with contract are:

> 1. that the acts were intentional and willful;
>
> 2. that they were calculated to cause damage to the plaintiffs in their lawful business;
>
> 3. that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and
>
> 4. that actual damage and loss resulted.

*Cenac v. Murry*, 609 So. 2d 1257, 1268-69 (Miss. 1992) (quoting *Liston v. Home Ins. Co.*, 659 F. Supp. 276, 281 (S.D. Miss. 1986)). "An action for interference with the contract ordinarily lies when 'a party maliciously interferes with a valid and enforceable contract[,] causing one party not to perform and resulting in injury to the other contracting party.'"

14

*Nichols v. Tri-State Brick & Tile Co.*, 608 So. 2d 324, 328 (Miss. 1992) (quoting *Mid-Continent Tel. Corp. v. Home Tel. Co.*, 319 F. Supp. 1176, 119 (N.D. Miss. 1970)).

¶26.   The typical tortious-interference case involves actions by the defendant to induce some third party to break a contract with the plaintiff. *See, e.g.*, *Cenac*, 609 So. 2d at 1268. In this case the claim is essentially that Anheuser-Busch induced *Rex* to break the contract through the threat of legal action. It is a peculiar inversion of the typical tortious-interference case, but the tort encompasses more than just the typical case—the elements do specify exactly how the interference must occur. *See id.* at 1268-69; *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 129 (5th ed. 1984) (noting that tortious interference can be found when a wrong is committed against the plaintiff instead of the plaintiff's contracting partner). "[I]n many cases interference with contract is not so much a theory of liability in itself as it is an element of damage resulting from the commission of some other tort . . . ." Keeton et al., *supra*, § 129.

¶27.   Mitchell argues it cannot be liable for tortious inference, since *Mitchell* is not alleged to have committed any of the acts that constitute interference. The complaint alleges that "Anheuser-Busch and Mitchell interfered with [the sale to Adams] through an intentional and willful scheme to redirect the sale of Rex's business from Adams to Mitchell," but all of the specific acts of interference are attributed to Anheuser-Busch rather than to Mitchell. Nonetheless, there is an allegation of concerted action—Anheuser-Busch and Mitchell worked together, and Anheuser-Busch could not have done it without Mitchell's participation. Thus, Rex alleged Mitchell was a joint tortfeasor and is liable for Anheuser-

15

Busch's wrongful acts. *See **D & W Jones, Inc. v. Collier***, 372 So. 2d 288, 292 (Miss. 1979) ("All who actively participate in any manner in the commission of a tort, or who command, direct, advise, encourage, aid or abet its commission, are jointly and severally liable therefor." (quoting ***Hutto v. Kremer***, 222 Miss. 374, 76 So. 2d 204 (1954))).

¶28.   Mitchell goes on to argue that "Rex does not allege that the match and redirect (or purchase and assign) provision contained in Paragraph 4(d) of the Equity Agreement is unlawful or unenforceable due to BIFDA." This claim ignores Rex's arguments throughout the litigation and instead points to a specific word choice in the complaint—the complaint alleged that Anheuser-Busch violated BIFDA when it "refused to accept Rex's sale to Adams." According to Mitchell, this means Rex alleged only that BIFDA was violated by the refusal and not by the assignment to Mitchell. We find the contention meritless, and we further note that when considering a motion to dismiss, the factual allegations in the complaint should be construed "in a manner most favorable to the non-movant." ***Tucker v. Hinds Cty.***, 558 So. 2d 869, 872 (Miss. 1990) (citing ***Rathborne v. Rathborne***, 683 F.2d 914, 918 (5th Cir. 1982)).

¶29.   Mitchell next points out that the sale contract to Adams required the consent of Yuengling, which had not yet been given at the time Anheuser-Busch made the demand for the assignment to Mitchell. According to Mitchell, there can be no cause of action for tortious interference with a contract when performance depends on a condition precedent. Mitchell offers no authority on this point, and our own review suggests the prevailing view is the opposite, as long as the plaintiff can prove the condition precedent would have

16

occurred. *See **SCEcorp v. Superior Court***, 4 Cal. Rptr. 2d 372, 375-78 (Cal. Ct. App. 1992) (surveying authorities). That allegation was made expressly in the complaint.

¶30. Next, Mitchell argues there is no allegation it acted with specific animus toward Rex. But the "malice" required for tortious inference with contract is a term of art, and under Mississippi law, it can be inferred from certain acts:

> The element of willfulness and calculation does not require a showing on the part of the plaintiff that defendant had a specific intent to deprive plaintiff of contractual rights. Rather, the requisite intent is inferred when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract.

***Par Indus., Inc.***, 708 So. 2d at 48 (emphasis omitted) (quoting ***Liston***, 659 F. Supp. at 281).

¶31. Mitchell then contends in a cursory fashion that it cannot be found to have committed tortious interference because it had a "justifiable interest and reason for acting" or was "exercising a legitimate interest or right." The assertion is essentially that as long as it was to Mitchell's financial advantage to do what it did, its actions could not be tortious interference. That is simply not the rule, as *Prosser and Keeton on the Law of Torts* has explained,

> The defendant is also permitted to interfere with another's contractual relations to protect his own present existing economic interests, such as the ownership or condition of property, or a prior contract of his own, or a financial interest in the affairs of the person persuaded. He is not free, under this rule, to induce a contract breach merely to obtain customers or other prospective advantage . . . .

17

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 129 (5th ed. 1984) (footnotes omitted). Mitchell had no present existing interest in Rex's business and thus cannot claim the protection of this rule.

¶32. Finally, Mitchell contends the tortious interference claim should be dismissed because Rex failed to plead that it proximately caused Rex's damages. But Rex certainly makes that allegation in the complaint: "But for [Anheuser-Busch] and Mitchell's interference, Rex would have consummated its sale to Adams and received the full $50.5 million purchase price. [Anheuser-Busch] and Mitchell's interference is the proximate cause of Rex's $3.1 million loss." Mitchell then contends Rex cannot show proximate cause because it went through with selling its business to Mitchell. This contention is unsupported by authority or argument in Mitchell's brief on appeal. "It is the duty of the briefing party to cite to authority which supports its argument." *Hatfield v. Deer Haven Homeowners Assoc., Inc.*, 234 So. 3d 1269, 1273 (Miss. 2017) (internal quotation marks omitted) (quoting *Russell v. Real Prop. Servs., LLC v. State*, 200 So. 3d 426, 430 (Miss. 2016)). Failure to cite authority waives the issue on appeal. *See id.* Mitchell also claims Rex cannot show proximate cause because Yuengling is entirely to blame for the damages, but, again, this assertion is unsupported by argument or authority.

¶33. We conclude that the trial court erred in dismissing Rex's claim against Mitchell for tortious interference with contract.

### 5. Civil Conspiracy—Mitchell

18

¶34. Finally, Rex contends the trial court erred in dismissing its claim that Mitchell is liable for Anheuser-Busch's acts under a theory of civil conspiracy. Under Mississippi law, the elements of a civil conspiracy are: "(1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013) (quoting *Gallagher Bassett Servs. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004)). The elements "are quite similar to those required of a criminal conspiracy, with the distinguishing factor being that 'an agreement is the essence of a criminal conspiracy,' while 'damages are the essence of a civil conspiracy.'" *Id.* (quoting 15A C.J.S. *Conspiracy* § 7 (2012)).

¶35. First, Mitchell contends there was no underlying tort and therefore no civil conspiracy. But there is an underlying wrong—Anheuser-Busch's alleged violation of the statute prohibiting it from interfering with transfers of Rex's business, the Beer Industry Fair Dealing Act (BIFDA), as we explained above. Mitchell is alleged to have agreed to and participated in Anheuser-Busch's course of action, before and after Anheuser-Busch formally demanded that Rex sell to Mitchell instead of Adams.

¶36. Mitchell also erroneously contends that its liability for civil conspiracy depends on *Mitchell's* having committed an overt act that damaged Rex. This is a fundamental misstatement of the nature of civil conspiracy—it exists as a cause of action to hold nonacting parties responsible. Rex has to show an unlawful overt act and it has to show

19

damages, but the overt act need not be by Mitchell. *See **Jeffcoat***, 887 So. 2d at 786. As explained in ***Jeffcoat***,

> Under Mississippi law, "[a] conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." ***Levens v. Campbell***, 733 So. 2d 753, 761 (Miss. 1999). Where a civil conspiracy gives rise to damages, a right of recovery may arise. ***Roussel v. Hutton***, 638 So. 2d 1305, 1315 (Miss. 1994). It is elementary that a conspiracy requires an agreement between the co-conspirators. *See **Brown v. State***, 796 So. 2d 223, 226-27 (Miss. 2001) (conspiracy is "a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy," and the "persons must agree . . . in order for a conspiracy to exist").

***Jeffcoat***, 887 So. 2d at 786.

¶37. Because we have held that Rex stated a claim when it alleged Anheuser-Busch violated BIFDA, we also reverse the dismissal of Rex's civil-conspiracy claim against Mitchell.

### CONCLUSION

¶38. The trial court erred in dismissing Rex's Beer Industry Fair Dealing Act (BIFDA) claim against Anheuser-Busch, as well as its claims of tortious interference with a contract and civil conspiracy against Mitchell. The judgment is reversed on those counts, and the case is remanded for further proceedings consistent with this opinion. Otherwise, the judgment is affirmed.

¶39. **AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.**

**GRIFFIS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶40.   This interlocutory appeal considers whether the circuit court correctly granted the motions to dismiss for failure to state a claim under Mississippi Rule of Civil Procedure 12(b)(6) filed by Anheuser-Busch and the Mitchell Companies.[4]

¶41.   As to Anheuser-Busch, the majority makes two rulings that conflict.  First, the majority reverses the circuit court's decision in favor of Anheuser-Busch on Rex's statutory claim under the Mississippi Beer Industry Fair Dealing Act (BIFDA).  *See* Miss. Code Ann. §§ 67-7-1 to -23 (Rev. 2012).  The majority concludes, as a matter of law, that BIFDA "rendered the match-and-redirect provision null and void . . . ."  Maj. Op. ¶ 17.  I disagree with and dissent from this holding.

¶42.   Next, the majority finds that the circuit court correctly dismissed the breach-of-contract claim because Rex asserted a claim under the "disapproval" or "same price" provision of the Wholesaler Equity Agreement (Paragraph 4(b)(v)) and not under the "match and redirect" provision (Paragraph 4(d)).  I concur with this holding and the majority's decision to affirm the dismissal of the "other claims" against Anheuser-Busch.

¶43.   I disagree with and dissent from the majority's holding that the circuit court erred in granting a motion to dismiss as to the Mitchell Companies.  I would affirm the dismissal of the Mitchell Companies.

---

[4] The Complaint named as defendants Mitchell Beverage, LLC, Mitchell Rex Distributing, LLC, and Mitchell Distributing Company, Inc.  The Complaint also referred to these separate entities collectively and did not specify the relationships of each entity.  For this opinion, I adopt the collective identification of these entities as "the Mitchell Companies."

21

## I. Standard of Review

¶44. A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint. *Lagniappe Logistics, Inc. v. Buras*, 199 So. 3d 675, 677 (Miss. 2016). We do not defer to the trial court's ruling. *Jourdan River Estates, LLC v. Favre*, 212 So. 3d 800, 803 (Miss. 2015). If the issue presented is a question of law, we review it de novo. *Id.* If the issue is a question of fact, we limit our review to the face of the complaint, and we accept the allegations of the Complaint as true. *City of Meridian v. $104,960.00 U.S. Currency*, 231 So. 3d 972, 974 (Miss. 2017). A Rule 12(b)(6) motion to dismiss should not be granted unless "it appears beyond a reasonable doubt that the plaintiff will be unable to prove any set of facts in support of the claim." *City of Meridian*, 231 So. 3d at 974 (citing *Rose v. Tullos*, 994 So. 2d 734, 737 (Miss. 2008)).

## II. Claims Asserted Against Anheuser-Busch

¶45. The majority begins its analysis with the BIFDA claim. Two applicable contracts govern the analysis of this claim. In 1997, Rex and Anheuser-Busch entered the "Amended and Restated Anheuser-Busch, Inc. Wholesaler Equity Agreement." Then, in 2016, Rex and Adams Beverages of Mississippi, LLC, entered an Asset Purchase Agreement.

¶46. Our review should start with an analysis of Rex's claims against Anheuser-Busch for breach of contract.

### A. Breach-of-Contract Claim

¶47. The majority correctly rules that the circuit court properly dismissed Rex's breach-of-contract claim against Anheuser Busch. My analysis differs slightly.

¶48. Count I of the Complaint alleges,

### [Anheuser-Busch]'s Breach of Contract Claim

65. Rex and [Anheuser-Busch] entered a Wholesaler Equity Agreement. The Wholesaler Equity Agreement was a valid and binding contract between Rex and [Anheuser-Busch]. The provisions of the Wholesaler Equity Agreement govern [Anheuser-Busch]'s exercise of "match and redirect" rights with respect to Rex's sale of its business.

66. Specifically, the Wholesaler Equity Agreement requires that if "[Anheuser-Busch] disapproves a proposed owner . . . and if a sale is eventually completed to a party preferred and designated by [Anheuser-Busch], then [Anheuser-Busch] **shall ensure that the selling Wholesaler receives the same price**, net of taxes, Wholesaler would have received from the disapproved purchaser."

67. The Wholesaler Equity Agreement gives [Anheuser-Busch] the right and option to purchase Rex's ownership interest, but only "at the **price and on the terms and conditions applicable to such proposed [transfer]**, subject to the following: . . . [Anheuser-Busch] may assign such right to any third party selected by [Anheuser-Busch], so long as [Anheuser-Busch] . . . remains liable to [Rex] for payment of the purchase price, if such third party violates its obligation to pay such purchase price to Wholesaler."

68. [Anheuser-Busch] assigned its right to purchase Rex's distributorship to Mitchell, but [Anheuser-Busch] did not ensure that Rex received the same price it would have received from Adams. [Anheuser-Busch] breached the Wholesaler Equity Agreement.

69. [Anheuser-Busch] is liable to Rex for all damages caused by its breach of the Wholesaler Equity Agreement, including the loss of the full purchase price.

(Emphasis added.)

¶49. These allegations refer to two provisions of the Wholesaler Equity Agreement: (1) the "disapproval" or "same price" provision in Paragraph 4(b)(v), and (2) the "match and redirect" provision in Paragraph 4(d). In relevant part, these provisions state,

23

4.     Ownership of Wholesaler

Although this is a personal service agreement and the participation of Manager is vital to both parties, the ownership of Wholesaler is also important because it is the owner or owners who have the right to establish basic policies and have the responsibility of providing financing, personnel, equipment and facilities for the effective operation of the business. . . . Therefore, because the participation of the owner(s) could also have a significant effect on the sale of Anheuser-Busch Products and the performance of this Agreement, the parties agree as follows:

(a) Unless Wholesaler shall have followed the procedures set forth in subparagraphs (b) and (c) below, this Agreement shall immediately terminate pursuant to the terms of paragraph 6 whenever there is a change of ownership in Wholesaler's business. . . .

(b) A change of ownership of Wholesaler's business is a matter of vital concern to both Anheuser-Busch and Wholesaler. Anheuser-Busch recognizes Wholesaler's desire to obtain the best available price for its business. Wholesaler understands that the ability of Anheuser-Busch to successfully market its Products in the Territory is dependent upon the financial, marketing and other qualifications of the prospective purchaser of Wholesaler's business. The parties acknowledge that these objectives are not mutually exclusive and recognizing Wholesale's desire to obtain the best available price for Wholesaler's business from a purchaser who is fully qualified to market the Products and fulfill the obligations set forth in this Agreement, they agree that the following provisions are necessary and desirable for both Wholesaler and Anheuser-Busch:

> (i) *If an owner of Wholesaler desires to sell, transfer or otherwise dispose of any interest in Wholesaler, then Wholesaler shall notify Anheuser-Busch by submitting a Notice of Intent to Sell . . .* prior to the commencement of any negotiations or related discussions with any prospective purchaser or other third party . . . . Wholesaler shall cooperate with Anheuser-Busch and provide it with such information as Anheuser-Busch may require in order to extend an offer to purchase such interest in the business. If such discussions result in an agreement between Wholesaler and Anheuser-Busch, the parties shall promptly effectuate such agreement.
>
> . . . .

24

(iv) In determining whether to approve or disapprove, as the case may be, a proposed purchaser of an ownership interest in Wholesaler's business, Anheuser-Busch shall be concerned with the qualifications of the proposed purchaser to fulfill the obligations of this Agreement and the effects of the resulting business combination, including but not limited to, the resulting Territory configuration (if the proposed purchaser is already an Anheuser-Busch wholesaler) and the potential advantages and disadvantages of market combinations. In evaluating the proposed owner's qualifications, Anheuser-Busch may consider such factors as it deems appropriate . . . .

(v) *If Anheuser-Busch disapproves a proposed owner in Wholesaler's business solely because of* (A) concern with the resulting Territory configuration or (B) market combinations to achieve economies of scale or enhanced sales opportunities, and if a sale is eventually completed to a party preferred and designated by Anheuser-Busch, then *Anheuser-Busch shall ensure that the selling Wholesaler receives the same price, net of taxes, Wholesaler would have received from the disapproved purchaser*.

. . . .

(d) At any time prior to the date on which Anheuser-Busch approves or disapproves a proposed transfer of an ownership interest in Wholesaler's business, *Anheuser-Busch shall have the right and option to purchase this ownership interest at the price and on the terms and conditions applicable to such proposed change*, subject to the following:

. . . .

(ii) Anheuser-Busch shall exercise its rights to purchase such ownership interest under this subparagraph 4(d) by notifying Wholesaler in writing. Subject to subparagraph 4(d)(iii) below, upon receipt of such notice Wholesaler agrees to promptly execute such documents and take such actions as may reasonably be required to transfer such ownership as contemplated herein.

. . . .

(iv) After notifying Wholesaler that Anheuser-Busch intends to exercise its right to purchase such ownership interest of Wholesaler in accordance with this subparagraph 4(d), *Anheuser-Busch may assign*

*such right to any third party selected by Anheuser-Busch*, so long as Anheuser-Busch (A) assigns this right to a third party legally qualified to purchase and operate the business of Wholesaler under the laws of the applicable State, and (B) *remains liable to Wholesaler for payment of the purchase price, if such third party violates its obligation to pay such purchase price to Wholesaler.*

(Emphasis added.)

¶50. After considering the motion to dismiss, the circuit court ruled,

Count I, Breach of Contract, alleges [Anheuser-Busch] breached the Wholesaler Equity Agreement. Rex put its business up for sale to the highest and best bidder, which it considered to be Adams. The Wholesaler Equity Agreement Rex had with [Anheuser-Busch] provided that [Anheuser-Busch] had to approve the purchase or it could "match and redirect" it. Prior to the sale's completion, [Anheuser-Busch] exercised this right and redirected the sale of Rex's [Anheuser-Busch] distributorship to Mitchell. Pursuant to the agreement [Anheuser-Busch] had to ensure that the sale was "at the price and on the terms and conditions" as set forth in the Asset Purchase Agreement between Rex and Adams. Adams had offered Rex a total of $50.5 million, which Rex claims is the "price" it was entitled to receive from Mitchell. However, before the sale of assets by Rex to Mitchell was consummated, Yuengling, another of Rex's suppliers, withheld its consent to the sale and terminated its contractual relationship with Rex. As a result Rex did not have a Yuengling distributorship to transfer to Mitchell. The Asset Purchase Agreement provides that if one of Rex's suppliers refuses to give consent to the transaction "then the purchase price shall be reduced by the portion of the purchase price attributable" to such supplier. The Yuengling distributorship rights were valued at $3.1 million which were the deducted from the offered price of $50.5 million. The sale to Mitchell was then completed. Rex is attempting to recover the $3.1 million.

Rex specifically agreed to the terms and conditions of the sale by executing the two contracts. [Anheuser-Busch] did not breach its contract with Rex because [Anheuser-Busch] exercised its lawful contractual right to "match and redirect" the sale from Adams to Mitchell under the "terms and conditions" of the contracts. The Court further notes that even though Rex claims that it was "forced" to conclude the sale from Rex to Mitchell, in fact, Rex voluntarily concluded the sale. Rex took the risk that Yuengling would not approve if AB decided to match and redirect.

26

¶51. The circuit court was correct to rule that the allegations of the Complaint established that Anheuser-Busch exercised its rights under the "match and redirect" provision (Paragraph 4(d)). And the circuit court was correct to rule that Anheuser-Busch was obligated to Rex "for payment of the purchase price, if such third party violates its obligation to pay such purchase price to Wholesaler." The Complaint alleged that Rex received payment of $47.4 million of the original purchase price of $50.5 million. Rex contends that it lost $3.1 million because Yuengling did not consent to the sale of Rex's Yuengling distributorship to the Mitchell Companies.

¶52. The Complaint alleged that, under Paragraph 4(d), Anheuser-Busch had the right to purchase Rex's "ownership interest at the price and on the terms and conditions applicable to such proposed change" and that Anheuser-Busch "remains liable to [Rex] for payment of the purchase price." For this, Rex was paid $47.4 million.

¶53. As to the loss of $3.1 million because Yuengling did not consent to the sale to the Mitchell Companies, the Asset Purchase Agreement provided in Section 5.l(d) that

> Consents. Payoff Letters, and Releases Not Obtained at Closing.
> . . . If any Supplier other than Anheuser Busch expressly refuses to deliver a Consent . . . , or has conditioned consent on conditions that are unacceptable to Purchaser, in Purchaser's sole discretion (in either event a "Rejection", and such Brand for which such Supplier has refused to give Consent shall be an "Excluded Brand"), then *the Purchase Price shall be reduced by the portion of the Purchase Price attributable to such Excluded Brand*, and [Adams] shall not be required to sell and Purchaser shall not be required to purchase such Excluded Brand or any Inventory associated with such Excluded Brand, if such third party violates its obligation to pay such purchase price to Wholesaler.

(Emphasis added.)

27

¶54. Yuengling did not consent. Under Section 5.1(d) of the Asset Purchase Agreement, "then the Purchase Price shall be reduced by the portion of the Purchase Price attributable to such Excluded Brand." The circuit court was correct to rule, as a matter of law under the Mississippi Rule of Civil Procedure 12(b)(6) standard, that Rex did not have a contractual right to receive the $3.1 million that Adams had agreed to pay for the Yuengling distributorship.

¶55. The circuit court's analysis was correct and should be affirmed. Because this is consistent with the majority's holding, I concur.

### B.     Violation of Beer-Industry-Fair-Dealing-Act Claim

¶56. Having determined that Anheuser-Busch did not breach the terms of the Wholesaler Equity Agreement, we should then consider whether Anheuser-Busch violated BIFDA.

¶57. Count V of the Complaint alleges,

> [Anheuser-Busch]'s Violation of Beer Industry Fair Dealing Act
>
> 87.     The Mississippi Beer Industry Fair Dealing Act states that a supplier "shall not interfere with, prevent or unreasonably delay the transfer of the wholesaler's business, including an assignment of wholesaler's rights under the agreement, if the proposed transferee is a designated member, or if the transferee other than a designated member meets such nondiscriminatory, material and reasonable qualifications and standards." Miss. Code. Ann. § 67-7-13(2).
>
> 88.     Adams was a qualified transferee under § 67-7-13 because at all material times Adams met [Anheuser-Busch]'s "nondiscriminatory, material and reasonable qualifications and standards."
>
> 89.     [Anheuser-Busch] had no good cause related to "nondiscriminatory, material and reasonable qualifications and standards" to refuse to accept the transfer of Rex's business to Adams. [Anheuser-Busch]'s refusal to accept the transfer of Rex's business to Adams was in bad faith.

28

90. As a result of [Anheuser-Busch]'s violation of § 67-7-13(2), Rex lost the full purchase price of its sales contract with Adams, and incurred damages of at least $3. l million.

91. [Anheuser-Busch] is liable under § 67-7-21(2) for all damages incurred by Rex as a result of its violation of § 67-7-13(2) as well as court costs and reasonable attorneys' fees.

¶58. After considering the motion to dismiss, the circuit court ruled,

Count V alleges Violations of Mississippi's Beer Industry Fair Dealing Act [BIFDA]. It is Rex's position that AB violated Miss. Code Ann. § 67-7-13(2) by refusing to accept the transfer of Rex's business to Adams. The section states that a supplier "shall not interfere with, prevent or unreasonably delay the transfer of the wholesaler's business, including an assignment of wholesaler's rights under the agreement, if the proposed transferee is a designated member, or if the transferee other than a designated member meets such nondiscriminatory, material and reasonable qualifications and standards." Rex transferred its business to Mitchell under the same terms and conditions that it negotiated with Adams for the AB assets. Yuengling terminated Rex's right to distribute Yuengling products and transferred those assets to another wholesaler. Thus there was no violation of BIFDA.

¶59. The majority concludes the circuit court committed reversible error as to this issue. The majority rules that "BIFDA rendered the match-and-redirect provision null and void, and Anheuser-Busch's demands premised on the void provision may have amounted to unjustified 'interference' with Rex's transfer to Adams . . . ." Maj. Op. ¶ 17.

¶60. This finding is in conflict or inconsistent with the majority's findings on Count 1—Breach of Contract. If the "match and redirect" provision is "null and void" under BIFDA, then it could not also be enforceable in the same action.

¶61. I agree with the majority that no Mississippi court has interpreted Mississippi Code Section § 67-7-13(2). Yet, with no supporting authority, the majority concludes that

29

Anheuser-Busch's decision to exercise its contractual rights in the Wholesaler Equity Agreement "prevented" and "interfered" with Rex's intended transfer to Adams.

¶62.    We start with Section 67-7-13:

Transfer of business and assignment of rights of wholesalers.

(1) Upon written notice of intent to transfer the wholesaler's business, any individual owning . . . may transfer the wholesaler's business to a designated member, or to any other person who meets the nondiscriminatory material and reasonable qualifications and standards required by the supplier for similarly situated wholesalers. The consent or approval of the supplier shall not be required of any transfer of the wholesaler's business, including the assignment of the wholesaler's rights under the agreement, to a designated member or shall not be withheld or unreasonably delayed to a proposed transferee who meets such nondiscriminatory, material and reasonable qualifications and standards. . . .

. . . .

(2) *The supplier shall not interfere with, prevent* or unreasonably delay *the transfer of the wholesaler's business*, including an assignment of wholesaler's rights under the agreement, if the proposed transferee is a designated member, or if the transferee other than a designated member meets such nondiscriminatory, material and reasonable qualifications and standards required by the supplier for similarly situated wholesalers. *Where the transferee is other than a designated member, the supplier may in good faith and for good cause related to the reasonable qualifications refuse to accept the transfer of the wholesaler's business or the assignment of the wholesaler's rights under the agreement.*

Miss. Code Ann. § 67-7-13 (Rev. 2012) (emphasis added).

¶63.    Under Section 67-7-13(2), Anheuser-Busch "shall not interfere with, prevent or unreasonably delay the transfer of [Rex]'s business." *Id.* A proper statutory interpretation does not stop there.

¶64. The second sentence of Section 67-7-13(2) provides that Anheuser-Busch may "refuse to accept the transfer of [Rex]'s business or the assignment of [Rex]'s rights under the agreement."[5] Under the second sentence of Section 67-7-13(2), Anheuser-Busch took an action to "match and redirect" the sale to the Mitchell Companies. Anheuser-Busch's (and the Mitchell Companies') actions were indeed lawful under the Wholesaler Equity Agreement and BIFDA.

¶65. If we must delve into the definition of "interfere," Mississippi courts have considered and interpreted the term "interference." In *Par Industries, Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998), this Court considered the tort of "interference" with performance of a contract. The Court ruled,

> When a person causes another to breach a contract with some third person, the tort is one of interference with performance of a contract. The four elements for this tort are: "(1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) *that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice)*; and (4) that actual damage and loss resulted." *Cenac v. Murry*, 609 So. 2d 1257, 1268–69 (Miss.1992) (citing *Liston v. Home Ins. Co.*, 659 F. Supp. 276, 281 (S.D. Miss. 1986)).

*Par Indus., Inc.*, 708 So. 2d at 48 (emphasis added). Clearly, the third element is the Court's interpretation or pronouncement as to what conduct constitutes "interference."

¶66. For there to be "interference," there must be some action that is "done with the *unlawful purpose* of causing damage or loss, without right or justifiable cause on the part of

---

[5] The reference to a "designated member" under the analysis of Section 67-7-13(2) is not relevant. Adams was the intended transferee and was clearly a "transferee other than a designated member." Miss. Code. Ann. § 67-7-13(2).

the defendant (which constitutes malice)." ***Id.*** (emphasis added) (quoting ***Cenac***, 609 So. 2d at 1268-69). I am of the opinion that Anheuser-Busch's actions, undertaken under a contractual right, cannot and should not be considered "interference." Moreover, Anheuser-Busch did not act to cause Rex "damage or loss." In fact, as discussed above, Anheuser-Busch had to pay Rex the amount of compensation that Adams was obligated to pay.

¶67. As to the word "prevent," the sale was consummated consistent with the terms of the Asset Purchase Agreement; just not to Adams.

¶68. The circuit court was correct to find that Anheuser-Busch was not in violation of BIFDA. I respectfully dissent from the majority's decision to reverse and remand the dismissal of Rex's claim against Anheuser-Busch for a violation of BIFDA.

### C. Other Claims Against Anheuser-Busch

¶69. I concur with the majority's decision that Rex has failed to properly raise the circuit court's dismissal of other claims asserted against Anheuser-Busch. Rex neither argued nor cited authority to contest the dismissal of its claims against Anheuser-Busch for bad faith breach of contract, tortious interference with contract, civil conspiracy, or punitive damages.

¶70. As to the claim that Anheuser-Busch tortiously interfered with its contract, I would add that clear legal authority contradicts Rex's position. In ***Cenac***, the Court explained,

> [A] cause of action exists by a party to a contract against some third, outside person who causes the party not to perform. Thus, in order to pursue a cause of action, it is accepted that the wrongdoer is a "stranger" to the contract which was interfered with—an outsider. "A party to a contract cannot be charged with interfering with his own contract." As the tort of interference with contract has evolved, it is settled that, "[a] defendant's breach of his own contract with the plaintiff is of course not a basis of the tort." Therefore, tortious interference with performance of a contract is unavailable as a theory

32

of relief for the Cenacs in that the wrongdoer (Murry) is also a party to the contract.

*Cenac*, 609 So. 2d at 1269 (second alteration in original) (citations omitted). Indeed, if Anheuser-Busch had breached its contract with Rex, the breach would not be a tort. *Id.* "His remedy is in contract and for breach." James L. Robertson, *The Law of Business Torts in Mississippi*, 15 Miss. College L. Rev. 331, 360 (1995).

### III.  Claims Asserted Against the Mitchell Companies

### A.  Claims Against Mitchell Distributing Company, Inc.

¶71.  The Complaint identified the Mitchell Companies as follows:

> Defendants Mitchell Beverage, LLC, Mitchell Rex Distributing, LLC, and Mitchell Distributing Company, Inc. (collectively, "Mitchell") are two Mississippi limited liability companies and one Mississippi corporation, respectively, that operate as a single business enterprise or joint venture.

The Complaint did not specify any separate conduct or actions by these individual legal entities.  Mitchell Distributing Company, Inc., filed a separate motion to dismiss under Rule 12(b)(6).  The circuit court ruled,

> Plaintiff has alleged that Mitchell Distributing, Mitchell Beverage, LLC, and Mitchell Rex Distributing, LLC, "operate as a single business enterprise or joint venture." Such an accusation would require piercing the corporate veil. Piercing the corporate veil is reserved for "those extraordinary factual circumstances where to do otherwise would subvert the ends of justice." *Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 1046 [(Miss. 1989)] (citing *Johnson & Higgins of Miss., Inc. v. Comm'r of Ins.*, 321 So. 2d 281, 284 (Miss. 1975)). A corporate entity will not be disregarded in contract claims unless the complaining party can demonstrate: (1) some frustration of expectations regarding the party to whom he looked for performance: (2) the flagrant disregard of corporate fom1alitics by the defendant corporation and its principals; and (3) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder. *Gray*, 541 So. 2d at 1047. *Penn Nat. Gaming, Inc. v. Ratliff*, 954 So. 2d 427, 431 (Miss. 2007). Plaintiff alleges

nothing beyond the allegation that these entities "operate as a single business or joint venture." This conclusory allegation fails to establish a potential "single business" claim against Mitchell Distributing.

The joint venture allegation also fails. The critical elements of the existence of a joint venture are (1) intent (2) control, and (3) profit sharing. *Mayer v. Angus*, 83 So. 3d 444 (Miss. Ct. App. 2012). This complaint fails to make any assertion regarding the corporations which could lead to the proof required to establish that a joint venture exists. Plaintiff's single allegation fails to allege a claim that would entitle plaintiff to a finding that the corporations were involved in a joint venture.

¶72. It is important to note that Rex does not challenge this ruling.

## B. Claim for Tortious Interference with Contract

¶73. Count III of the Complaint alleged,

[Anheuser-Busch]'s and Mitchell's Tortious Interference with Contract

74. Rex had a valid and enforceable agreement to sell its distributorship to Adams for $50.5 million.

75. [Anheuser-Busch] and Mitchell interfered with that agreement through an intentional and willful scheme to redirect the sale of Rex's business from Adams to Mitchell.

76. [Anheuser-Busch] and Mitchell were aware that redirecting the sale of Rex's business to Mitchell would cause Rex to lose the ability to sell its Yuengling distribution rights, which were worth at least $3. l million.

77. Based on information and belief, the purpose of [Anheuser-Busch] and Mitchell's interference was to reward Mitchell and marginalize Yuengling – to [Anheuser-Busch]'s benefit, at Rex's expense. [Anheuser-Busch] and Mitchell's interference prevented Rex from transferring its Yuengling distribution rights to another distributor who could distribute Yuengling over Rex's entire territory. [Anheuser-Busch] and Mitchell therefore knew that Rex would be damaged by their actions.

78. But for [Anheuser-Busch] and Mitchell's interference, Rex would have consummated its sale to Adams and received the full $50.5 million purchase

price. [Anheuser-Busch] and Mitchell's interference is the proximate cause of Rex's $3.1 million loss.

79.     [Anheuser-Busch] and Mitchell are jointly and severally liable to Rex for all damages caused by their tortious interference with Rex's agreement with Adams.

¶74.   There are four elements to a claim for tortious interference with contract:

1.     that the acts were intentional and willful;

2.     that they were calculated to cause damage to the plaintiffs in their lawful business;

3.     that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and

4.     that actual damage and loss resulted.

*Cenac*, 609 So. 2d at 1268-69 (quoting *Liston*, 659 F. Supp. at 281)).

¶75.   The Mitchell Companies contend that Rex cannot establish the third element of this tort: "that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice)." *Id.* (quoting *Liston*, 659 F. Supp. at 281).

¶76.   The only authority cited by the majority is that "Rex alleged Mitchell was a joint tortfeasor and is liable for Anheuser-Busch's wrongful acts." Maj. Op. ¶ 27. *See D & W Jones, Inc. v. Collier*, 372 So. 2d 288, 292 (Miss. 1979) ("All who actively participate in any manner in the commission of a tort, or who command, direct, advise, encourage, aid or abet its commission, are jointly and severally liable therefor." (quoting *Hutto v. Kremer*, 222 Miss. 374, 76 So. 2d 204, 208 (1954))).

35

¶77. The Complaint does not assert any factual allegations that would establish an "unlawful purpose" or that the Mitchell Companies actions were "without right or justifiable cause." Considering all factual allegations in the Complaint in the light most favorable to Rex, there are simply no facts that would support a finding that the Mitchell Companies acted with an unlawful purpose.

¶78. The fact that the Mitchell Companies are engaged in the business of a beer distributorship is not unlawful. The fact that the Mitchell Companies were interested in purchasing another beer distributorship under the Anheuser-Busch brand is not unlawful. The fact that the Mitchell Companies entered an agreement with Anheuser-Busch to purchase the Rex distributorship after Anheuser-Busch exercised its contractual rights was not unlawful. In fact, Rex was paid the agreed-upon price.

¶79. Rex argues that the Mitchell's argument on this issue "splits hairs, unconvincingly." I disagree. As discussed above, since the circuit court was correct to dismiss Rex's claims against Anheuser-Busch, there is simply no basis to determine that Mitchell's actions were wrongful or unlawful. Mitchell had a "justifiable economic interest" to accept Anheuser-Busch's decision to match and redirect the purchase of Rex's assets.

¶80. I would affirm the circuit court's dismissal of the tortious-interference-with-contract claim against the Mitchell Companies.

### C. Claim for Civil Conspiracy

¶81. Count III of the Complaint alleged,

> [Anheuser-Busch]'s and Mitchell's Tortious Interference with Contract

36

81.     [Anheuser-Busch] and Mitchell conspired to redirect the sale of Rex's business from Adams to Mitchell.

82.     Based on information and belief, the purpose of AB and Mitchell's conspiracy was to reward Mitchell and marginalize Yuengling – to [Anheuser-Busch]'s benefit, at Rex's expense. AB and Mitchell's interference prevented Rex from transferring its Yuengling distribution rights to another distributor who could distribute Yuengling over Rex's entire territory. [Anheuser-Busch] and Mitchell therefore knew that Rex would be damaged by their actions.

83.     In furtherance of their conspiracy, in addition to many other overt acts, [Anheuser-Busch] exercised its match and redirect rights under the Wholesaler Equity Agreement to force Rex to sell its business to Mitchell, and Mitchell consummated that transaction.

84.     But for [Anheuser-Busch] and Mitchell's conspiracy, Rex would have consummated its sale to Adams and received the full $50.5 million purchase price. [Anheuser-Busch] and Mitchell's conspiracy is the proximate cause of Rex's $3.1 million loss.

¶82.   The circuit court ruled,

Rex also makes a conspiracy claim against Mitchell Beverage. A civil conspiracy claim requires "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." ***Gallagher Basset***[***t***] ***Services, Inc. v. Jeffcoat***, 887 So. 2d 777, 786 (Miss. 2004). It requires "(1) an agreement between two or more persons, (2) an unlawful purpose, (3) an overt act in furtherance of the conspiracy, and (4) resulting damages to the plaintiff." Rex's claim for tortious interference fails. As a result, the claim for civil conspiracy cannot rest on that tort and also fails. See ***Wells v. Shelter General Ins. Co.***, [217] F. Supp. 2d 744, 755 (S.D. Miss. 2002). Mitchell Beverage lawfully assumed Adams's rights and obligations under the APA. The conclusory allegations do not support that any acts taken pursuant to the assignment or APA were done with an unlawful purpose. Given the failure of the tortious interference claim, there are insufficient allegations to support a conspiracy to tortiously interfere with Rex's contract with Adams. The only overt act Mitchell Beverage committed is that it agreed to step into Adams's position after [Anheuser-Busch] exercised its right to reassign the contract to another wholesaler. This is not a sufficient allegation to support a claim of civil conspiracy.

¶83. A conspiracy requires an agreement "to accomplish an unlawful purpose or a lawful purpose unlawfully . . . and damages to the plaintiff as a proximate result." **Bradley v. Kelley Bros. Contractors**, 117 So. 3d 331, 339 (Miss. Ct. App. 2013) (citing **Jeffcoat**, 887 So. 2d at 786).

¶84. As previously discussed, there was no action by the Mitchell Companies that was "to accomplish an unlawful purpose or a lawful purpose unlawfully." The fact that Mitchell was willing to have the sale redirected to it neither demonstrates an attempt to accomplish an unlawful purpose or an attempt to accomplish a lawful purpose unlawfully. Also important is that Rex received the compensation it was entitled to receive under the Asset Purchase Agreement. Even were there a civil conspiracy, no damages would have resulted.

¶85. I would affirm the circuit court's orders to dismiss the claims Rex asserted against Anheuser-Busch and the Mitchell Companies. Therefore, I concur in part and dissent in part.

**KING, P.J., JOINS THIS OPINION.**